Gary OGDEN, Appellant,

v.

Charles L. WOLFF, Jr., Warden, Nebraska Penal and Correctional Complex, Appellee.

Danny ATKINSON, Appellee,

v.

Charles L. WOLFF, Jr., Warden, Nebraska Penal and Correctional Complex, Appellant.

Nos. 75–1042, 75–1083.

United States Court of Appeals, Eighth Circuit.

Submitted May 16, 1975.

Decided Sept. 8, 1975.

Rehearings Denied Oct. 6 and Oct. 16, 1975.

James M. Kelley, Lincoln, Neb., for Gary Ogden, appellant, in No. 75–1042 and Danny Atkinson, appellee in No. 75–1083.

Terry R. Schaaf, Dept. of Justice, Sp. Asst. Atty. Gen., Lincoln, Neb., for Charles L. Wolff, Jr., appellee in No. 75–1042 and appellant in No. 75–1083.

Before GIBSON, Chief Judge, and HEANEY and STEPHENSON, Circuit Judges.

STEPHENSON, Circuit Judge.

The sole issue in these consolidated state habeas appeals, brought under 28 U.S.C. § 2254, is whether the non-disclosure to petitioners' attorney of the written record of the polygraph examination and pre-test interview conducted upon the prosecutrix in petitioners' trials for statutory rape resulted in a denial of fundamental fairness at those trials. We find that it did not. Accordingly, we affirm the district court's[1] denial of a writ of habeas corpus to petitioner Og-

1. The Honorable Albert G. Schatz, United States District Judge for the District of Nebraska.

den and reverse the granting of the writ to petitioner Atkinson.

Petitioners were charged with the crime of having carnal knowledge of a female child under 15 years of age in violation of Neb.Rev.Stat. § 28–408 (Cum.Supp.1972). The charges arose out of an incident that occurred in Holt County, Nebraska in May of 1972. The prosecutrix was 14 years old and in the eighth grade at the time she was allegedly raped by petitioners Ogden and Atkinson and one Gary Seger.[2] Petitioners were respectively 19 and 23 years old. A detailed account of the facts in this case would serve no purpose here. A full, factual statement may be found in the Nebraska Supreme Court opinions rendered in each petitioner's appeal. *See State v. Atkinson*, 190 Neb. 473, 209 N.W.2d 154 (1973); *State v. Ogden*, 191 Neb. 7, 213 N.W.2d 349 (1973).

Atkinson was initially tried and convicted by a Nebraska state court jury in September 1972. However, that conviction was vacated when the court granted his post-conviction motion for a mistrial. He was subsequently tried again and convicted in October 1972. Ogden was convicted by a state court jury in December 1972. In each of these trials the petitioners steadfastly maintained that they had not personally engaged in intercourse with the prosecutrix, nor had they witnessed any of the other defendants doing so. The testimony of the prosecutrix was the sole evidence at each trial that the individual defendants had raped her. Her testimony was corroborated by the testimony of a doctor who examined her and found evidence that sexual intercourse had taken place.[3] Further corroboration is discussed in *State v. Atkinson, supra*, 209 N.W.2d at 158. Both men received sentences of not less than four or more than seven years imprisonment.

In January 1973 counsel for petitioners was apprised of the existence of a written report and transcription of the polygraph examination and a summary of the pre-test interview conducted with the prosecutrix on August 8, 1972, prior to petitioners' trials. This report contained statements by the prosecutrix that were somewhat inconsistent with her testimony at petitioners' trials. These inconsistencies related to the issue of penetration and to a variety of minor factual details regarding the rape incident. Following this discovery, the attorneys for Ogden made a motion for a new trial based on newly discovered evidence. The motion was subsequently joined in by Atkinson and Gary Seger, the third man charged and convicted. At the hearing which was held on the motions, testimony was taken from the attorneys involved plus the polygraph examiner.

The evidence adduced at that hearing revealed the following facts. The polygraph examination of the prosecutrix took place on August 8, 1972, approximately three months after the alleged rapes. Trial counsel for petitioners stated that he had verbally suggested to the court attorney that such an examination be conducted for the purpose of determining whether petitioners and Gary Seger had had sexual relations with the prosecutrix as charged. Counsel heard nothing further about the matter until after the test had taken place.

The examination was administered by Nebraska State Patrolman Vern C.

---

2. Gary Seger is not a party to this appeal. He was convicted by a state court jury and joined in petitioners' motion for a new trial based upon newly discovered evidence. Following the denial of that motion, he was placed on probation. He did not pursue an appeal to the Nebraska Supreme Court.

3. The doctor who examined the prosecutrix shortly after the alleged rapes testified at At-

kinson's second trial that he found a tear in her hymen from which blood was still oozing. In addition, the doctor testified that he extracted fluid from her vagina which, under microscopic examination, was discovered to contain live sperm. In his opinion, forcible entry of her vagina had occurred within three or four hours prior to his examination.

Omer, who had been contacted by the county attorney for that purpose. The examination was conducted in two parts. First, the polygraph operator interviewed the prosecutrix informally regarding the events that were alleged to have occurred on the night in question. This process provided background information from which specific questions could be formulated for use in the monitored segment of the examination. The second portion of the test involved asking these specific questions and monitoring the responses in an attempt to determine their veracity.

Within two days following the examination, the operator submitted a written report to the county attorney which contained a summary of the pre-test interview[4] and a transcription of the specific questions and answers[5] and the operator's evaluation of the individual. Upon receipt of that report, the county attorney telephoned the defense attorney who represented both petitioners and informed him that the prosecutrix had been given and had "passed" a polygraph examination. He mentioned, however, that the young woman had expressed some doubt as to penetration by the defendants.

Petitioners' attorney maintains that he was at no time prior to the trial of his clients informed of the existence of a written report. In the absence of any mention by the prosecutor, he presumed that the results were simply transmitted orally to the county attorney. As a result of this presentation, the defense attorney did not request a copy of the report. It was the failure of the county attorney to supply petitioners' attorney with a copy of this report prior to trial that led to the filing of these actions.[6]

Subsequently, these petitions for writs of habeas corpus were filed in the federal district court alleging, on the basis of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that the

---

4. The relevant portions of the summary provided, in substance, as follows:

The prosecutrix's initial incident was with Gary Seger alone in a field. He ordered her to undress, and when she refused to do so, he undressed her and laid her on the ground. He removed his pants and attempted for 15 minutes to have sex with her. The report states that "at no time did he [Seger] get his penis into her vagina."

Following this incident, the prosecutrix dressed herself and rejoined Ogden and Atkinson. Atkinson then undressed her and himself and attempted to have sex with her. The report stated, "He got on top of her and tried to put his penis in her vagina. He kept telling her to spread her legs a little further, however, she stated he did not get his penis in because it was too large. She stated he tried for awhile and finally gave up and got off of her." Next, Ogden got on top of her and "did penetrate her vagina with his penis," reaching a climax.

Later in the evening, Ogden and the prosecutrix had sexual relations in the back of Atkinson's car. Once again he "had gotten his penis in her vagina and . . . stayed on her until he reached a climax." Subsequently, Atkinson again attempted to have sexual relations with her. "At the time he told her that she better let him do it to her, or they would be there all night. She stated that Danny Atkinson couldn't get his penis into her at this time and because it was too large and he finally gave up and quit." Finally, Ogden got on top of her once again and "did penetrate her, however, she didn't think that he reached a climax."

5. The relevant questions and answers in the monitored portion were as follows:

25. Did you let any of the three boys have sexual relations with you? No answer.
26. Have you ever had sexual relations before that night? No.
27. Did Gary Seger get his penis into you? No.
28. Did you let Gary Seger take your clothes off? No.
29. Did you let Gary Ogden have sexual relations with you? No.
30. Did you take off any of your clothes? No.
31. Did you help any of them have sexual relations with you? No.
32. Did you spread your legs for them? No.
33. Did you have sexual relations with anyone else besides the three boys that night? No.

6. The motions for new trials upon the grounds of newly discovered evidence were denied by the state trial court and affirmed in *State v. Atkinson*, 191 Neb. 9, 213 N.W.2d 351 (1973), and in *State v. Ogden*, 191 Neb. 7, 213 N.W.2d 349 (1973).

non-disclosure of the written polygraph report constituted a denial of due process. A hearing was held in the district court at which testimony was received from the attorneys involved in the case. Based on this evidence and the trial transcripts, the district court concluded that the non-disclosure of the written polygraph report constituted a denial of fundamental fairness as to Atkinson but not as to Ogden. In this court, the state appeals from the granting of the writ to Atkinson, and Ogden appeals from the denial of habeas relief to him.

■ It is well established that a prosecutor has a duty to disclose to the accused all favorable evidence within his control and knowledge that is material to the defense. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This court in *Evans v. Janing*, 489 F.2d 470 (8th Cir. 1973), explored in detail the principles applicable to the "evolving law of favorable evidence." *Id.* at 474. No useful purpose would be served in reciting once again those general principles or in listing the dozens of cases in which they have been applied and expanded. *See generally* Annot., 34 A.L.R.3d 16 (1970, Supp.1974).

■ As was noted in *Evans*, the specific tests that must be applied in non-disclosure cases in order to determine whether a violation of due process had occurred were discussed and succinctly set forth in *Moore v. Illinois*, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). As stated by the Supreme Court in *Moore* :

> The heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence.

*Id.* at 794–95, 92 S Ct. at 2568. Petitioners' claims must be measured against these standards in order to determine whether the alleged deprivation of due process has taken place.

## A. SUPPRESSION

■ The initial question is whether or not the prosecutor in this case suppressed the written report of the prosecutrix's polygraph examination. In this context, "suppression" means non-disclosure of evidence that the prosecutor, and not the defense attorney, knew to be in existence. *Evans v. Janing, supra,* 489 F.2d at 475.

In the instant case, it is conceded that Robert Finn, the county attorney for Holt County, was aware of the polygraph report's existence in written form prior to the trial of either petitioner. Finn testified that he was sent a copy of the report shortly after the examination, discussed its contents with the examiner, and used it to some extent in preparing his case.

There is a slight degree of uncertainty regarding the defense attorney's knowledge of the written report. Attorney Edward Hannon, who represented both petitioners in their state trials, indicated that he was merely informed by Finn that the prosecutrix had "passed" the examination and that she had expressed some doubts concerning the issue of penetration. He testified that he did not know of the existence of a written transcription until after his clients were convicted. While Finn admits that he never told Hannon that the report was written, he asserts that neither did he deceive Hannon into believing that the report was oral; nor did he ever refuse anyone access to the report. Finn claims that he would have furnished Hannon a copy of the report had a bequest been made. It is undisputed that no such request was made.

■ We have concluded that the foregoing evidence amply illustrates that the suppression element of the *Moore* test is satisfied here. The suppression in this case was not deliberate. If it were, the defense burden of showing materiali-

ty might be eased. *See United States v. Harris*, 462 F.2d 1033, 1035 (10th Cir. 1972). Instead, we find that the suppression in this case was more an act of negligent non-disclosure which required some showing of fundamental unfairness as a result of the suppression in order to merit relief. *United States v. Keogh*, 391 F.2d 138 (2d Cir. 1968). *See generally United States v. Kahn*, 472 F.2d 272, 287 (2d Cir. 1973). Similarly, the fact that no defense request was made does not relieve the prosecutor from his *Brady* obligation to disclose evidence that may be helpful to the defense. However, unless the suppression is deliberate or shocking to the conscience, the lack of a request imposes upon the non-disclosed evidence a higher standard of materiality which must be met to constitute a fundamental unfairness. *Evans v. Janing, supra*, 489 F.2d at 475–76; *United States v. Keogh*, 391 F.2d 138 (2d Cir. 1968). *Cf. Williams v. Wolff*, 473 F.2d 1049, 1054 (8th Cir. 1973). The ultimate effect of this "knowing non-disclosure" in light of the failure to make a request will be fully explored below in the section on materiality.[7]

## B. FAVORABLE CHARACTER OF THE EVIDENCE

█ The second facet of the *Moore* test is whether or not the non-disclosed evidence was favorable to the complaining party. In applying this standard, we need not consider the degree to which the evidence might aid the petitioners. We are satisfied that the polygraph report involved here was favorable. Its value as impeachment evidence on the issue of penetration and as to other inconsistencies demonstrates its utility to the defense.

As noted by this court in *Evans*:

The burden of demonstrating that the evidence was of a favorable nature is slight. The more crucial burden is the third test in *Moore*, the materiality of the evidence.

489 F.2d at 476–477.

## C. MATERIALITY

Petitioners contend that the polygraph examination report constituted evidence of such critical significance and materiality to their defense that its suppression constituted fundamental unfairness which can only be remedied by the issuance of writs of habeas corpus. Where, as here, the guilt or innocence of each man depended entirely upon the testimony of the rape victim, the petitioners maintain that suppression of a prior inconsistent statement amounted to a denial of due process. In their view, the fact that the report could have been valuable to the defense in negating guilt and in impeaching the prosecution's primary witness fully satisfies the materiality requirement from *Moore* and *Brady*.

Various specific instances of the inconsistencies alluded to are offered to the court by petitioners. For example, prosecutrix testified at each of the trials that both petitioners plus Gary Seger had achieved penetration of her vagina. This was the only evidence in the record regarding the specific acts of rape by the individual defendants. When asked at trial how she knew that this penetration had occurred, the prosecutrix replied that she felt pain in the area of her sexual organs on each occasion.

However, petitioners point out that in the pre-test portion of the polygraph examination she stated that, of the three men charged with raping her, only Gary

---

7. We reject the suggestion by the state that we analyze the non-disclosure here merely in terms of the defense attorney's "lack of due diligence" in failing to make a request for the report. The concept of due diligence is related to motions for a new trial based upon newly discovered evidence, a wholly procedural device intended, it would seem, to insure that attorneys make every reasonable discovery ef-

fort prior to trial. The use of this concept to block consideration of alleged due process violations would be a triumph of procedure over substance. *See United States v. Poole*, 379 F.2d 645, 648–49 (7th Cir. 1967). The raising of the materiality standard in the event of a failure to request evidence, discussed *supra*, is an adequate sanction.

Ogden actually achieved penetration. As to Atkinson she related to the examiner that he attempted to enter her on two separate occasions but was unable to do so. A similar explanation was given regarding Seger's activities. The pretest interview contained no mention of pain during these incidents.

In addition, petitioners note that in the monitored portion of the polygraph examination prosecutrix responded negatively to the question, "Did Gary Seger get his penis into you?" Also, it is urged that her "No" answer to the question "Did you let Gary Ogden have sexual relations with you?" serves to exonerate that man. Petitioners contend that these contradictions were extremely material to the issue of their guilt or innocence and thus the report could not be withheld from them without causing fundamental unfairness.

Further, petitioners point to, in their words, a "plethora of contradictions" on other matters between prosecutrix's polygraph examination and her trial testimony. They maintain that these inconsistencies, while of a seemingly minor significance in and of themselves,[8] become important in the aggregate and are even further magnified due to the singular accusatory role played by prosecutrix. In their view, the impeachment of her on each of these matters, coupled with the prior inconsistent statements regarding penetration, would have provided a reasonable doubt of guilt in the minds of the jurors. Thus, they conclude, the prosecutor's non-disclosure of this inherently material polygraph report renders their convictions constitutionally invalid.

Before we can determine whether the due process rights of Ogden and Atkinson have been violated by the suppression here involved, the evidentiary value of that suppressed report must be determined. The applicable standard of materiality for purposes of the third prong of the *Moore* test is dependent on such categorization.

For example, it has been held by this court that the suppression of any evidence which is probative on the issue of guilt or innocence can constitute a denial of due process. *Link v. United States*, 352 F.2d 207, 212 (8th Cir. 1965). However, that case further holds that

[a]s to evidence not of that character and having admissibility only for the purpose of impeachment or credibility attack, nondisclosure or suppression, to be violative of due process, would in our opinion, unless the situation is otherwise tainted, have to be of such inherent significance as to represent fundamental unfairness.

*Id.* See also *United States v. Miller*, 499 F.2d 736, 744 (10th Cir. 1974).

█ In order to meet the "fundamental unfairness" test from *Link*, the defendant must show that "there was a significant chance that this added item [the suppressed evidence], developed by skilled counsel as it would have been, could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." *Shuler v. Wainwright*, 491 F.2d 1213, 1223 (5th Cir. 1974) *quoting from United States v. Miller*, 411 F.2d 825, 832 (2d Cir. 1969). See also *Evans v. Janing, supra*, 489 F.2d at 477 & n. 19; *United States v. Kahn*, 472 F.2d 272, 289 (2d Cir.), *cert. denied*, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973); *United States v. Harris*, 462 F.2d 1033, 1035 (10th Cir. 1972). This is the standard that will be applied in the instant case. As will be set out in detail below, our examination of the suppressed polygraph report in light of the evidence adduced at petitioners' trial convinces us that its usefulness to the defense would have been as impeachment evidence.

█ We first consider the value of the evidence as to Ogden. Ogden's ini-

8. Specifically, petitioners note inconsistencies between her trial testimony and her statements to the polygraph operator on the following topics: (1) whether or not she had been drinking beer on the night of the incident; (2) whether or not she was forced into Gary Seger's car; (3) whether or not Seger asked her age; (4) the seating arrangement in the car; and (5) whether or not she engaged in a third act of intercourse with Ogden.

tial contention is that the prosecutrix's answer to question # 29 in the polygraph examination regarding whether she "let" Ogden have sex with her, exonerates him and is therefore directly relevant to his guilt or innocence. We find this evidence to be of little or no value. The use of the word "let" by the polygraph operator was unfortunate in that it injected an unnecessary element of ambiguity into a procedure that was intended to resolve rather than create uncertainty. Ogden assumes in his argument that the word "let" refers to the *fact* of intercourse. An equally plausible interpretation would substitute the word "permit" for "let." Under this theory, any value to Ogden arising out of the question and answer is lost.

As noted by the district court, the credibility of this "permit" interpretation is enhanced when one studies the question immediately preceding the one in issue. In response to the question, "Did you let Gary Seger take your clothes off?", she answered "No." Since there is no dispute over the fact that her clothes were in fact removed, Ogden's "fact of occurrence" definition of the word "let" makes no sense in this context. We are assuming, of course, that the word "let" was intended to have the same meaning in these consecutive questions. In any event, the ambiguity of this question and answer is so great as to render the statement wholly without exculpatory value.

Instead we find that the report as a whole could have been useful to Ogden only as a tool for impeaching the general credibility of prosecutrix. As such it would have been primarily cumulative. She was extensively cross-examined at each trial with reference to inconsistencies between her testimony at trial regarding penetration and a myriad of other factual details compared with earlier statements made by her under oath at a preliminary hearing and at Atkinson's trials. Further impeachment on these collateral matters would not have served any appreciable credibility-impugning purpose.

In addition, the impeachment value of her allegedly conflicting statements regarding the pain she experienced during intercourse is greatly diminished by the fact that the polygraph operator, unlike the prosecutor, did not specifically inquire of her as to pain. Finally, as noted by the district court in its memorandum opinion, her claim of pain is amply corroborated by the doctor's testimony as to her post-rape physical condition.

Applying the elevated materiality standard from *Link* to this impeachment evidence, we have concluded that Ogden has not shown that the suppression of the polygraph report as to him constituted fundamental unfairness. Accordingly, the district court's denial of his petition for a writ of habeas corpus is affirmed.

A somewhat closer question is presented with regard to Atkinson's petition. Because they arose from the same factual and legal setting, the habeas petitions by Atkinson and Ogden raise essentially the same issues and are subject to the same treatment. Thus, the argument made by Ogden regarding the impeachment value of the polygraph report as it relates to prosecutrix's pain or to the long list of minor factual inconsistencies with her trial testimony is similarly found to be constitutionally unpersuasive as to Atkinson. Furthermore, Atkinson's contentions regarding inconsistencies in her testimony as to penetration by Ogden or Seger are likewise immaterial to his guilt or innocence.

However, the district court found that prosecutrix's statements in the pre-test portion of the polygraph examination regarding penetration by Atkinson were of an entirely different nature. Her unequivocal statement that Atkinson, on two separate occasions, was unable to penetrate her with his penis was found to be so "inherently material and highly important" as to justify an issuance of a writ of habeas corpus. We disagree.

The essence of the district court's holding is that the

combined effect of the two prior inconsistent statements of the prosecutrix on the key factual issue concerning Atkinson's guilt could well have created a reasonable doubt in the minds of the jurors.

Our examination of the trial transcript convinces us that prosecutrix was vigorously cross-examined on the issue of penetration at Atkinson's second trial. She was impeached on two occasions as to the differences between her trial testimony and her testimony at the preliminary hearing. Furthermore, the version of the incident related by prosecutrix to the polygraph operator is so similar to the version on which she was impeached that its trial effect would only have been as cumulative evidence of impeachment.

The impeachment episode at Atkinson's trial came very early in the cross-examination of prosecutrix. In all candor it must be stated that, at least from the admittedly cold record before us on appeal she was a somewhat confusing witness. On direct examination she stated simply that Atkinson "placed his penis in my vagina." However, only a few moments later the following exchange took place with the defense attorney:

Q. Kathy, do you remember the last trial?

A. Yes.

Q. When I asked if you had ever told anybody that you did not know whether Danny Atkinson got into you?

A. Yes.

Q. And what was your answer to that question at that time?

A. That he never.

Q. That he didn't get in?

A. Yes.

Q. And were you then asked by Mr. Finn why you did not think he got it into you?

A. What was that again?

Q. Were you then, later, in the same examination, asked by Mr. Finn why you did not think he got into you?

A. Yes.

Q. And you stated at that time, "Because I did not feel anything," is that what you stated?

A. Yes.

Q. Is that still your testimony in this case?

A. Yes.

Q. Now, when you say that, are you referring only to the first alleged time, that is out near the water hole that you testified to? Is this when you are speaking of, or both times?

A. Both times.

Q. Both times. And you still do not know—you still don't think he got into you, is that your testimony?

A. Yes.

Illustrative of the confusion with which her testimony was fraught is the following question and answer, removed in sequence from the foregoing impeachment exchange by only four brief questions.

Q. Now, when these men were on you, what did they do if anything? They just laid on you for 15 minutes each?

A. No.

* * * * * *

Q. What did they do then?

A. They put their penis into my vagina.

The foregoing appears to be a completely impeaching incident. In one breath the prosecutrix told the jury that she had previously stated *under oath* that Atkinson had not "gotten in." She further stated that she still believed that he and the other men had not penetrated her. Yet only seconds later she apparently completely contradicted herself by announcing that Atkinson and the others had in fact penetrated her vagina. Whatever credibility she had in the eyes of the jury on the difficult issue of penetration was no doubt shaken by this series of questions and answers.

The polygraph pre-test in dispute here did not contradict her testimony regarding Atkinson's two attempts to rape her. At no time does prosecutrix contradict herself as to the fact that Atkinson twice removed his clothing and hers. Nor was she inconsistent on the issue of the sexual nature of his advances. The suppressed statement was merely at odds with her trial testimony on direct examination as to the extent to which those attempts at penetration were successful. Furthermore, her statements to the polygraph operator in which she doubted penetration by Atkinson were not at variance with her testimony at the preliminary hearing and on cross-examination at trial in which she stated that he didn't "get in." Viewed in this light, the impeachment evidence contained in the polygraph report had already been brought to bear on cross-examination.

In addition, we find persuasive on the issue of materiality the fact that the testimony and statements of prosecutrix must be viewed in light of her age and education. She was, at the time of the incident, a chaste 14 year old girl of average or below average intelligence. Legal and sexual technicalities were no doubt foreign to her. She explained the details of her rape as best she could, interspersing her testimony with somewhat technical terms that were not necessarily confined by her to their exact scientific or medical definition.[9] Yet despite these facts Atkinson seeks to overturn his conviction because she claimed penetration of her vagina at trial but referred only to repeated attempts at penetration in her pre-test interview with the polygraph operator. We feel that Atkinson has read too much specificity into the testimony of this witness.

Finally we note with regard to Atkinson's claim that the suppressed report was favorable to him and therefore material that, under Nebraska law, even the slightest penetration of the labial region constitutes rape.

In Atkinson's direct appeal to the Nebraska Supreme Court, *State v. Atkinson*, 190 Neb. 473, 209 N.W.2d 154 (1973), it was held that:

> It is not necessary that the vagina be entered or that the hymen be ruptured; the entry of the vulva or labium is sufficient. As we said in *State v. Chaney* (1969), 184 Neb. 734, 171 N.W.2d 787: "The slightest penetration of the sexual organ of the female is sufficient, if established beyond a reasonable doubt, to constitute the necessary element of penetration in a prosecution for rape, and such element may be proved by either direct or circumstantial evidence."

*Id.* at 157. Thus it seems quite apparent that the evidence in the suppressed polygraph report concerning Atkinson's unsuccessful "attempts" to have sexual relations with prosecutrix were sufficient under the law to constitute the crime with which he was charged. It appears that the report could have done him as much harm as good.

Based on our examination of the record in this case we are satisfied that Atkinson has not demonstrated that he was afforded a fundamentally unfair trial. *Link v. United States, supra,* 352 F.2d at 212. Nor do we find a "significant chance" that the suppressed report would have produced a reasonable doubt in the minds of the jury that convicted Atkinson. *Evans v. Janing, supra,* 489 F.2d at 477. Thus, we must reverse the district court's order granting a writ of habeas corpus to Atkinson.

Affirmed as to Ogden; reversed as to Atkinson.

---

**9.** For example, when asked by the defense attorney on cross-examination her understanding of the word "vagina" she replied "It is where you go to the bathroom."