**UNITED STATES of America, Appellee,**

**v.**

**Lonnie D. RHOADS, Appellant.**

**No. 79–1474.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 10, 1979.

Decided March 24, 1980.

Patrick James Fraley, Valley Park, Mo., for appellant;  Harold E. Horsley, Jr., Valley Park, Mo., on the brief.

Michael W. Reap, Asst. U. S. Atty., St. Louis, Mo., for appellee; Robert D. Kingsland, U. S. Atty., St. Louis, Mo., on the brief.

Before LAY, Chief Judge,* and HEANEY and HENLEY, Circuit Judges.

HENLEY, Circuit Judge.

In March, 1979 the defendant, Lonnie D. Rhoads, was indicted by the federal grand jury for the Eastern District of Missouri on fourteen charges of having violated the federal mail fraud statute, 18 U.S.C. § 1341.[1]

The defendant appeared initially without counsel and entered a plea of not guilty. The district court appointed a Clayton, Missouri attorney to represent the defendant.

There were a number of pretrial proceedings, including psychiatric examinations of the defendant. Trial began to a jury on April 30, 1979 with District Judge H. Kenneth Wangelin presiding. Defense motions for judgment of acquittal made at the close of the government's evidence and at the close of all of the evidence were denied. On May 3, 1979 the jury found the defendant guilty on all fourteen counts of the indictment.

Appointed counsel moved for a new trial asserting a number of claims, including a claim of newly discovered evidence. The government opposed that motion. It is inferable that by that time differences had arisen between the defendant and his trial counsel, and defendant had managed to employ St. Louis counsel to provide him with further representation. Those attorneys filed an amended motion for a new trial in which they alleged, among other things, that defendant had been denied the effective assistance of counsel during pretrial

stages of the case and at trial. On his own motion and without objection trial counsel was permitted to withdraw from the case. Defendant's new attorneys are representing him in connection with this appeal, and for convenience we will refer to them as appellate counsel; we will refer to defendant's original attorney as appointed counsel or as trial counsel.

In due course the trial judge denied the motion and amended motion for a new trial, and the defendant was sentenced on June 5, 1979 under the provisions of 18 U.S.C. § 4205(b)(1) and (d). That is to say, the defendant received initially the maximum sentence authorized by law but subject to possible reduction following a study and report by the Bureau of Prisons.

Immediately after the initial sentence was imposed defendant filed a notice of appeal and has been permitted to remain at large on bail.

For reversal the defendant contends that the government deprived him of due process of law by failing to reveal allegedly exculpatory material, that the government failed to make discovery as required by Fed.R.Crim.P. 16(a)(1)(C), that the evidence was insufficient to sustain the verdict, and that the representation that he received from his appointed attorney was so inadequate as to violate his right to counsel protected by the sixth amendment to the Constitution of the United States.

In the latter connection defendant argues that trial counsel failed to take proper steps to protect defendant's interests when persons who had been served on behalf of the defense with subpoenas duces tecum commanding them to produce certain business records appeared as government witnesses but failed to produce the records; defend-

---

* The Honorable Donald P. Lay became Chief Judge of the Eighth Circuit on January 1, 1980.

1. The statute is an old and familiar one. It provides in substance that any person who has devised a scheme or artifice to defraud or for the obtaining of money or property by means of false statements, promises or representa-

tions, and who for the purpose of carrying out the scheme or while undertaking to do so uses the mails or causes them to be used shall be deemed guilty of a felony and upon conviction shall be punished in the manner prescribed by the statute.

ant also argues that trial counsel improperly raised an alternative defense of insanity against the will and over the objection of defendant.

The government denies that any of those contentions has merit.

Upon full consideration of the voluminous record in the case, the appellate briefs and arguments of counsel, we affirm the judgment of the district court.

## I.

We find it convenient to discuss, first, the sufficiency of the evidence to sustain the conviction. Both sides are agreed that the burden was on the government to establish by evidence and beyond a reasonable doubt that the defendant devised a scheme or artifice to defraud substantially as alleged in the indictment, that the mails were used by the defendant or at his instance to carry out the scheme or in an attempt to carry it out, and, finally, that the defendant acted willfully and knowingly and with the specific intent to defraud the target or targets of the alleged scheme. Defendant's principal defense was that his actions, presently to be described, were not willful and were not actuated by any fraudulent intent.

In appellate context we are required to view the evidence in the light most favorable to the government, and to give to the government the benefit of all inferences in its favor reasonably to be drawn from the evidence. *United States v. Bruneau*, 594 F.2d 1190, 1198 (8th Cir.), *cert. denied*, —— U.S. ——, 100 S.Ct. 94, 62 L.Ed.2d 61 (1979); *United States v. Scholle*, 553 F.2d 1109, 1118 (8th Cir.), *cert. denied*, 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1977).

■ It must also be recognized that a defendant in a criminal case may properly be convicted on circumstantial as well as direct evidence. It is sufficient if the entire body of evidence, whether direct or circumstantial, or both, is adequate to convince the jurors beyond a reasonable doubt as to the truth of the charge. *See United States v. Hill*, 589 F.2d 1344, 1349 (8th Cir.), *cert. denied*, 442 U.S. 919, 99 S.Ct. 2843, 61 L.Ed.2d 287 (1979); *United States v. Little*, 562 F.2d 578, 580 (8th Cir. 1977); *United States v. Wisdom*, 534 F.2d 1306, 1309 (8th Cir. 1976).

■ And while intent to defraud is an essential element of the crimes charged, *United States v. Nance*, 502 F.2d 615, 618 (8th Cir. 1974), *cert. denied*, 420 U.S. 926, 95 S.Ct. 1123, 43 L.Ed.2d 396 (1975), the requisite intent may be inferred from the surrounding facts and circumstances, *United States v. Arnold*, 543 F.2d 1224, 1225 (8th Cir. 1976).

■ The indictment period extends from about January 1, 1973 to about the end of October, 1977. It is alleged that the scheme was directed at defendant's employer, Mermod, Jaccard & King Jewelry Company (Jaccard),[2] American Express Company (AmEx), and Visa/BankAmericard (Visa). The scheme is described in Count 1 of the indictment with some modification of the description in connection with Counts 13 and 14. Each count of the indictment charged a separate mail use. While the indictment alleged that the scheme was directed at both AmEx and Visa, the specific mail uses alleged all involved AmEx.

During the period in question Jaccard operated a number of retail jewelry stores in St. Louis, Missouri and at various locations in St. Louis County. Jaccard accepted retail credit cards issued by a number of companies including AmEx and Visa. Jaccard settled periodically with the finance companies, and the finance companies periodically settled with individual card holders who had used their cards to purchase goods

---

2. During that period of time Jaccard was a wholly owned subsidiary of Gordon Jewelry Corporation of Houston, Texas (Gordon), and that company possessed and exercised a good deal of control, financial and other, over the activities of Jaccard, although individual Jaccard stores possessed a substantial degree of autonomy in day to day operations.

or services on credit. The dealings between Jaccard and the credit card companies, and the dealings between those companies and the card holders naturally brought about extensive mail uses.[3]

Defendant was employed by Jaccard as area credit manager of Jaccard stores in the St. Louis area from July, 1967 to the date of his resignation in mid-October, 1977. At the commencement of his employment he was paid an annual salary of a little over $9,000.00; at the time of his resignation he was receiving an annual salary of somewhat more than $18,000.00. He was a married man and had four minor children.

As regional credit manager defendant had full control of credit transactions, including credit card transactions, taking place at the several stores within his area.

In connection with credit card transactions it was the function of the defendant periodically to prepare or cause to be prepared summaries showing debits, representing credit card sales made to customers, and credits, representing credits given to customers for goods that they had purchased by use of their credit cards and had been permitted to return. Those summaries, with supporting documents, including credit drafts, were mailed periodically to the credit card companies, and it was on the basis of those transmittals that the companies made settlements with Jaccard. The documents were also used by the companies in making up monthly statements mailed to card holders.

As indicated, the credit card companies would remit to Jaccard the amounts of periodic balances in favor of Jaccard remaining after the amounts of credits were subtracted from the amounts of debits. An increase in credits during a given period without an offsetting increase in debits would naturally reduce the net amount owed at the end of a period by the respective credit card companies to Jaccard. Both AmEx and Visa were compensated for the financial services that they provided to Jaccard, and as we understand it the amounts of compensation would depend upon amounts of credit card sales by Jaccard during a particular period less credits for returned merchandise.

Credits on account of returned merchandise would be reflected on the monthly bills received by the respective card holders, and in instances the credit item shown on the statement would exceed the charges or might even show that with respect to a particular billing period no charges had been made to the card holder but that he had a substantial amount to his credit.

In either situation, the card holder could draw against his net credit balance, if any, to make future credit purchases by the use of his credit card, or in some circumstances he might obtain a cash payment from the credit card company.

The defendant personally held credit cards issued by AmEx and Visa, and he, and perhaps other members of his family, used those cards to acquire goods or services on credit, and the government claimed that certain vacation trips taken by the family during the indictment period were financed by means of credit card use.

The theory of the government, as expressed in the indictment, is that the defendant used his position with Jaccard in such a manner as to permit him to submit or cause to be submitted false documents indicating that he, as an individual, was entitled to credit for returns of merchandise to Jaccard which merchandise in fact had never been purchased. According to the government, the defendant would then draw against the credit thus obtained by the use of his credit cards to make purchases of goods or services in the future. And it was alleged that in two instances (Counts 13 and 14 of the indictment) the defendant caused checks in his favor to be drawn by

---

3. The operation of Visa in dealing with participating merchants is somewhat different from corresponding dealings of AmEx, but the difference does not appear to be material here.

AmEx and sent to the defendant by mail at his home address. According to the government, the proceeds of the alleged fraud over the roughly four year indictment period amounted to around $100,000.00.

The defendant has never denied that he performed the operative acts that have been described, and he has never taken issue with the government as to the mail uses that were necessarily involved in the overall transactions.

The defendant's position immediately prior to indictment and at trial was that during the indictment period he had spent his own money in the business interest of Jaccard and had advanced personal funds in the same interest to other employees of Jaccard. He contended that he had not been reimbursed properly by his employer, and that he used his control of Jaccard's credit card transaction records to obtain reimbursement for his outlays from the credit card companies while reducing the amounts of the obligations of those companies to Jaccard in corresponding amounts.

The jury was instructed fully as to the elements of the offenses charged in the respective counts of the indictment and was told that the government had to prove by evidence and beyond a reasonable doubt that the defendant acted with fraudulent intent, and that if the jury believed that the defendant acted honestly and in good faith, or if the jury entertained any reasonable doubt on the subject, it should acquit the defendant.

During the indictment period the defendant was an experienced and responsible supervisory employee of Jaccard. If his "good faith" explanation of his highly unusual method of obtaining reimbursement for his outlays stood unimpeached on the record, it would be hard for reasonable fact finders to accept. As it was, the explanation was seriously impeached.

We think that at most defendant's explanation of his conduct raised a jury question. The jury was not required to accept his explanation and did not do so.

We hold that the evidence was sufficient to sustain the verdict, and that the district court did not err in refusing to enter a judgment of acquittal on motion of the defendant.

## II.

During the indictment period, or prior thereto, the defendant had borrowed some money from a savings and loan institution in St. Louis and had derived some income as a result of investments with a St. Louis investment firm. Corporate records of those transactions had been made and retained by the corporations involved. The government in the course of its investigation of the case learned of those transactions and they were considered by the grand jury in connection with its investigation of the tentative charges against the defendant. Copies of the records were made and were in the possession of the government when the defendant was indicted.

After the indictment was returned, the defendant moved pursuant to Fed.R. Crim.P. 16(a)(1)(C) for production of documents or material subject to disclosure under that rule. The government evidently provided certain material but did not provide copies of or information about the savings and loan and investment firm records.

The defendant contends here that in its failure to provide the material the government (1) denied defendant due process of law; (2) failed properly to comply with the discovery demand filed under Rule 16(a)(1)(C).

The constitutional claim is based ultimately on the landmark holding of the Supreme Court in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to the effect that where the government has in its possession exculpatory evidence the existence of which is not known to the defendant, due process of law requires that the government disclose the existence and nature of the evidence.

The defendant claims that if those records had been disclosed to him, the disclosure would have enabled him to show at trial that he had funds from independent sources with which to pay for vacation trips the government claimed that the defendant had financed by the use of credits obtained from AmEx and Visa, and that the credits that defendant so obtained did no more than reimburse him for personal outlays.

*Brady v. Maryland, supra,* is of no help to the defendant since *Brady* presupposes that a defendant is ignorant of exculpatory material in the hands of the government. *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976); *United States v. Riley,* 530 F.2d 767, 771 (8th Cir. 1976); *Ogden v. Wolff,* 522 F.2d 816, 820 (8th Cir. 1975), *cert. denied,* 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976); *United States v. Akin,* 464 F.2d 7, 8 (8th Cir.), *cert. denied,* 409 U.S. 981, 93 S.Ct. 315, 34 L.Ed.2d 244 (1972). In this case the defendant obviously knew of the transactions in question and of the fact that records of them had been made. Had those records been subpoenaed, they would have been forthcoming.

Rule 16(a)(1)(C) provides that a defendant is entitled to discovery by the government of documentary material in the possession or control of the government if the items are material to the preparation of the defendant's case, or if the government intends to use them as evidence in chief, or if they were obtained from or belonged to the defendant.

In our view the corporate documents that are involved here were not "material to the preparation" of the defense; they were not intended to be used, nor were they used as part of the evidence in support of the government's case in chief. And they were not obtained from and did not belong to the defendant. The records were those of the savings and loan institution and the investment company to which we have referred. *See and compare United States v. Miller,*

425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976); *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); *Couch v. United States,* 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973); *United States v. Stuart,* 587 F.2d 929 (8th Cir. 1978).

So, the Rule 16 claim is rejected as well as the constitutional claim.

### III.

The claim of the defendant that he was not adequately represented by counsel at and before trial was raised first by appellate counsel in the amended motion for a new trial filed on behalf of the defendant. The district court evidently did not consider that there was anything to that contention and did not bother to discuss it. We agree that the claim has no merit, but there are some comments that we think should be made.

It is settled in this circuit today that a defendant in a criminal case is constitutionally entitled to reasonably competent and diligent representation by counsel, whether employed or appointed. However, a defendant is not entitled to representation that results in an acquittal, nor is he entitled to the "best possible" representation. Neither is a defendant entitled, at the instance of new or substituted appellate counsel, to have this court review by hindsight tactical decisions made by trial counsel in the course of the trial. *See United States v. Bad Cob,* 560 F.2d 877 (8th Cir. 1977); *United States v. Malone,* 558 F.2d 435 (8th Cir. 1977); *Scott v. United States,* 545 F.2d 1116 (8th Cir. 1976), *cert. denied,* 429 U.S. 1111, 97 S.Ct. 1148, 51 L.Ed.2d 565 (1977); *United States v. Easter,* 539 F.2d 663 (8th Cir. 1976), *cert. denied,* 434 U.S. 844, 98 S.Ct. 145, 54 L.Ed.2d 109 (1977); *McQueen v. Swenson,* 498 F.2d 207 (8th Cir. 1974).

In past cases where a defendant has challenged post-trial the adequacy of his representation by counsel we have applied a two pronged test: (1) the defendant must show

that there was a dereliction of duty owed to him by counsel; (2) that the defendant was prejudiced by the dereliction. *See United States v. Malone, supra*, 558 F.2d at 438, and *McQueen v. Swenson, supra*, 498 F.2d at 218. In some circumstances the validity of the second prong of the test has been questioned. *See Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *see also Reynolds v. Mabry*, 574 F.2d 978, 980–81 (8th Cir. 1978). But we are satisfied that the question of prejudice resulting from inadequate representation as opposed to the question of inadequate representation itself is not presented in this case.

■ The defendant claims that he lacked adequate representation because trial counsel allegedly failed to protect diligently the defendant's interests when certain individuals who had been served on behalf of the defendant with subpoenas duces tecum commanding them to appear and produce certain documents appeared as government witnesses but without the documents.

Appellate counsel say that when that situation developed, trial counsel should have asked for a continuance or for a mistrial, insisting that the documents in question be produced.

In some circumstances that contention might have a good deal of weight. Here, however, in view of the nature of the case and the overall tenor of the evidence, including the defendant's admissions, we think that the decisions of trial counsel that are challenged here were permissible tactical decisions.

■ Somewhat more significant is the claim that trial counsel breached his duty to the defendant when counsel, over the personal objection of the defendant, injected into the case the issue of the defendant's sanity. That issue was put forward as an alternative defense after formal notice as provided by Fed.R.Crim.P. 12.2. The claim had two aspects: (1) that the defendant was legally insane as that term is now commonly defined in the federal courts; (2) that the defendant, even if not insane, was subject to a mental or psychological impairment to such a degree that he could not form the specific intent to defraud called for by the mail fraud statute. For purposes of discussion we assume that the defendant did not want either aspect of the question of his mental condition brought into the case and that the injecting of the issue was over his objection.

Prior to trial the defendant was examined by one psychiatrist retained by trial counsel and by another psychiatrist retained by the government. Both doctors were competent men and both testified at the trial.

No one has ever contended that the defendant was grossly insane in the sense that he was psychotic or the victim of brain damage or disease. There has been nothing to suggest that defendant's behavior has been influenced by drug abuse.

It is inferable, however, that defendant's pretrial attitude and his explanation of his conduct in relation to his employer and to the credit card companies caused his appointed counsel, counsel for the government, and perhaps even the trial judge, to suspect that there was something wrong with the defendant mentally, and that his mental condition should be evaluated, and that evaluation took place.

The testimony of the defendant's expert was to the effect that while defendant was not psychotic and had no organic brain disease, he suffered from a personality disorder that had caused him to become what is commonly known today as a "workaholic," and that his judgment had become so warped that within the framework of his employment he felt that his conduct in relation to his employer and the credit card companies was permissible, correct and proper, and that, consequently, he had no fraudulent intent in doing what he did. The testimony of the government's expert was directly to the contrary. That expert testified simply that there was nothing

mentally or psychologically wrong with the defendant.

The trial judge fully, fairly and correctly instructed the jury on both aspects of the claim involving the mental condition of the defendant. The jury rejected both aspects of the claim.

In the circumstances we see nothing incompetent, negligent or inadequate in the action of trial counsel in raising the issue of defendant's mental condition. Had counsel not done so, and had the defendant been convicted, counsel might well have been confronted post-trial with a complaint that he did not raise the issue. And it might be well for us to add that when a question of adequacy of representation at trial is raised in appellate context by new counsel hired by a defendant after he has been convicted, the original attorney ordinarily has little or no opportunity to speak out in his own justification.

To sum up, we hold that no trial errors requiring reversal were committed, that the defendant was competently and adequately represented by appointed counsel, and that the evidence was sufficient to sustain the verdict.

Affirmed.