UNITED STATES of America, Appellee,

v.

Leonard CROW DOG, Appellant.

No. 75–1617.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 13, 1975.

Decided March 31, 1976.

Rehearing and Rehearing En Banc
Denied April 22, 1976.

Stay Denied June 7, 1976.
See 96 S.Ct. 2620.

1184

Kenneth E. Tilsen, St. Paul, Minn., Jacqueline D. Quick, St. Paul, Minn., on brief, for appellant.

R. D. Hurd, Asst. U. S. Atty., Sioux Falls, S. D., William F. Clayton, U. S. Atty., David R. Gienapp, Asst. U. S. Atty., Sioux Falls, S. D., and Tom P. May, Legal Intern, on brief, for appellee.

Before GIBSON, Chief Judge, LAY and STEPHENSON, Circuit Judges.

STEPHENSON, Circuit Judge.

This direct criminal appeal is taken by appellant Leonard Crow Dog following his conviction by a jury of violating 18 U.S.C. §§ 111 and 2112. It is alleged on this appeal that a variety of trial and pretrial errors committed by the government and by the district court[1] require reversal of that conviction. We find no such reversible error and thereby affirm.

The great majority of the arguments raised on this appeal relate to procedural matters. The facts surrounding the incident which led to the indictment of Leonard Crow Dog are relevant only with regard to his claim that the evidence was insufficient to support his conviction. Accordingly, a thorough recitation of those facts will be reserved until that issue is discussed. However, in order to evaluate appellant's various contentions regarding procedural error, a detailed survey of the history of this case must be set forth.

## I.

Appellant Leonard Crow Dog was charged in a three-count indictment handed down by a grand jury in the District of South Dakota on December 12, 1974. These charges arose out of an incident that took place on March 11, 1973, in Wounded Knee, South Dakota, involving the alleged detention of four United States postal inspectors by members of the American Indian Movement (AIM).[2] Count I alleged that Crow Dog willfully impeded, interfered with and intimidated Postal Inspector Gene Graham while he was performing official duties in violation of 18 U.S.C. §§ 111 and 1114. Count II charged that Crow Dog by force and violence unlawfully took a pistol belonging to the United States from the person of one Jack Hanson in violation of 18 U.S.C. §§ 1153 and 2112, and Count III alleged that Crow Dog had taken various goods from the Wounded Knee trading post with a combined value in excess of $100, a violation of 18 U.S.C. §§ 1153 and 661. An identical indictment was returned against Carter Camp. Stanley Holder was indicted separately on counts I and II.

These December 12 indictments superseded indictments which had been returned in March and April of 1973 against these same three men plus Dennis Banks, Russell Means, Pedro Bissonette, and Clyde Bellec-

1. The Honorable Edward J. McManus, Chief Judge, United States District Court for the Northern District of Iowa.

2. An understanding of the Wounded Knee incident and the role played therein by the American Indian Movement may be gained by reference to a number of district court opinions which evolved from the trial of AIM leaders Dennis Banks and Russell Means. *See United States v. Banks*, 383 F.Supp. 389 (D.S.D.1974); *United States v. Banks*, 383 F.Supp. 368 (D.S. D.1974).

ourt. The earlier indictments charged all seven men with conspiracy in one count and alleged substantive offenses in ten other counts. In June 1973 these seven defendants moved to consolidate their cases for trial alleging, among other things, that seriatim trials would result in a denial of a speedy trial to some of the defendants. The district court[3] ordered a joint trial for Means and Banks but denied consolidation to the others. Review of that denial was attempted in this court by the filing of a petition for a writ of mandamus which was denied.

In October 1973 these same defendants moved for a change of venue pursuant to Fed.R.Crim.P. 21(a) and, after satisfying the court that prejudice against them existed in South Dakota, venue was transferred to St. Paul, Minnesota. The so-called "leadership" trial of Means and Banks began in January 1974 and ended with the district court's dismissal of all charges against them on September 13, 1974. *See United States v. Banks, supra,* 383 F.Supp. at 397. As previously noted, superseding indictments naming Crow Dog, Camp and Holder were returned on December 12, 1974. The original 11-count indictments against them were dismissed on February 5, 1975. Thereafter, Judge Nichol recused himself and reassigned the *Crow Dog, Holder,* and *Camp* cases to Judge Edward McManus, sitting by designation in the District of South Dakota.

A pretrial conference on these cases was held on April 16, 1975, at which numerous defense motions were filed seeking, *inter alia,* dismissal of the charges based upon denial of a speedy trial, bad faith prosecution and governmental misconduct; disclosure of all exculpatory and impeaching evidence by the prosecution; and a determination of venue and transfer from the district. In addition, the government filed a motion to consolidate the indictments against these three men for purposes of trial. On May 2, 1975, the district court transferred venue in these cases to the Northern District of Iowa, Cedar Rapids Division, stating that prejudice against Indians "created a reason-

able likelihood of impairing defendants' right to a fair trial in the District of South Dakota." However, the court rejected defendants' argument that the superseding indictments were merely a continuation of the earlier charges brought against these same men and that venue was still in St. Paul, Minnesota, pursuant to Judge Nichol's earlier transfer order. *United States v. Holder,* 399 F.Supp. 220 (D.S.D.1975). The government's motion to consolidate was granted by the court on May 12, 1975.

On May 27, 1975, a hearing on the motions regarding the denial of a speedy trial, prosecutorial misconduct, and discriminatory prosecution began. After three days of testimony, argument and the presentation of extensive documentary evidence on each of these issues, the motions to dismiss were taken under advisement by the court.

In an order entered on May 30, 1975, the district court disposed of the various discovery motions that had been filed by defendants. In summary, the court denied a request to examine all government files *in camera* for exculpatory evidence, ordered the government to provide defendants prior to trial with any information concerning government witnesses which bore on their credibility, and further ordered the government to produce for the court's *in camera* inspection the names and files of all informants involved in the case.

The consolidated trial against these three defendants commenced with the institution of the jury selection process on June 2, 1975. Pursuant to a defense motion, counsel for both sides were allowed to supplement the court's voir dire of the jury with their own questioning of individual jurors. The jury selection process took an entire day, the great majority of which was consumed by questions asked by counsel for the three defendants.

The prosecution began presenting its case following the swearing in of the jury and opening statements on June 3, 1975. After two and one-half days of testimony, principally by three of the postal inspectors who

---

**3.** The Honorable Fred J. Nichol, United States District Judge for the District of South Dakota.

were involved in the Wounded Knee incident, the prosecution rested. Motions to strike certain testimony and for a judgment of acquittal based upon insufficiency of the evidence were made by defense counsel and denied by the court. Defendants rested without presenting any testimony and immediately renewed their motion for judgment of acquittal. That motion was once again denied by the court. The jury returned a guilty verdict against Crow Dog and his co-defendants as to all charges on June 5, 1975.[4]

A post-trial motion was filed on June 27, 1975, in which the defendants sought a judgment of acquittal or a new trial based primarily upon the grounds of sufficiency of the evidence, the government's failure to disclose evidence, and problems with the in-court identification of the defendants. A second post-trial motion was filed on July 25, 1975, seeking an evidentiary hearing on the basis of newly discovered evidence, i. e., a group of photographs which were allegedly used for the purpose of identifying defendants and which had been suppressed by the government. The motion contended that the photographs included pictures of the defendants, that they had been shown to the postal inspectors on the day of the incident, and that no identification of defendants was made at that time. All of these motions were denied by the district court in a lengthy memorandum and order filed on August 4, 1975. *United States v. Crow Dog*, 399 F.Supp. 228 (N.D.Iowa 1975). On August 5, 1975, Crow Dog was sentenced to three years on Count I and eight years on Count II, the sentences to run concurrently. Execution of the sentences was suspended and Crow Dog placed on probation for a period of five years. Co-defendants Holder and Camp failed to appear for sentencing.

## II.

The first issue which we consider on this appeal is that of venue. Appellant con-

tends that the trial court erred in ruling that the superseding indictments began an independent prosecution which required a new determination of venue. 399 F.Supp. at 224–27. This, it is contended, violated appellant's constitutional right against having venue changed against his consent, as well as rights that he enjoyed under Fed.R. Crim.P. 21(a). Appellant further alleges that principles of collateral estoppel and law of the case precluded the district court from "overruling" the prior transfer of venue to St. Paul, Minnesota, by Judge Nichol. We disagree.

■ The Constitution in Article III, section 2, and the Sixth Amendment affords a defendant in a criminal trial the right to be tried in the state and district where the alleged crime occurred. However, the Sixth Amendment also provides the right to a fair trial before an impartial jury. This latter right is deemed to be a fundamental element of due process. *Singer v. United States*, 380 U.S. 24, 36, 85 S.Ct. 783, 790, 13 L.Ed.2d 630, 638 (1965); *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942, 946 (1955); *United States v. McNally*, 485 F.2d 398, 402 (8th Cir. 1973), *cert. denied*, 415 U.S. 978, 94 S.Ct. 1566, 39 L.Ed.2d 874 (1974). In recognition of this right, it is well-established that pretrial publicity may have had such an impact upon the populace from which the jury is drawn as to create a probability or at least a "reasonable likelihood" that this right of impartiality has been violated. *Sheppard v. Maxwell*, 384 U.S. 333, 362, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600, 620 (1966); *Irvin v. Dowd*, 366 U.S. 717, 721, 81 S.Ct. 1639, 1641, 6 L.Ed.2d 751, 755 (1961); *Wansley v. Slayton*, 487 F.2d 90, 92–98 (5th Cir. 1973), *cert. denied*, 416 U.S. 994, 94 S.Ct. 2408, 40 L.Ed.2d 773 (1974). With this contingency in mind, Fed.R.Crim.P. 21(a) provides for transfer of venue by the district court upon a motion by the defendant to that effect and a proper showing of prejudice. *See*

---

4. Count III of the December 12, 1974, indictments handed down against Camp and Crow Dog was severed prior to trial and then dis-

missed by the government following the jury's verdict.

United States v. Delay, 500 F.2d 1360, 1365 (8th Cir. 1974); United States v. McDaniel, 449 F.2d 832, 841–42 (8th Cir. 1971), cert. denied, 405 U.S. 992, 92 S.Ct. 1264, 31 L.Ed.2d 460 (1972). A prerequisite to a transfer determination is that an indictment or information stating the charges is on record. In re Investigation of World Arrangements, 107 F.Supp. 628, 630 (D.D.C. 1952); mandamus denied sub nom. In re Texas Co., 91 U.S.App.D.C. 272, 201 F.2d 177, cert. denied, 344 U.S. 904, 73 S.Ct. 283, 97 L.Ed. 698 (1952).

 Appellant Crow Dog made such a Rule 21(a) motion in the District of South Dakota following his indictment on 11 counts in 1973. The district court granted the motion and transferred venue to St. Paul, Minnesota. However, that indictment was dismissed in early 1975 pursuant to Fed.R.Crim.P. 48(a). The effect of this dismissal was to bring that prosecution to an end. See generally Gonzalis v. Lynch, 282 P.2d 255, 257 (Okl.Crim.1955). The superseding three-count indictment began an independent prosecution. Venue as to that indictment was properly set in South Dakota, the state and district where the alleged crimes took place. Any prior transfer of venue in a previous indictment had no effect on the subsequent indictment. Allowing an initial transfer of venue to bind all subsequent indictments brought against that defendant out of a common factual setting as urged by appellant would be inconsistent with the interplay of constitutional rights reflected in Fed.R.Crim.P. 18 and 21(a).[5] The district court's decision regarding venue did not constitute an abuse of discretion. Rizzo v. United States, 304 F.2d 810, 817 (8th Cir.), cert. denied, 371 U.S. 890, 83 S.Ct. 188, 9 L.Ed.2d 123 (1962). See also United States v. Jobe, 487 F.2d 268, 269 (10th Cir. 1973), cert. denied, 416

U.S. 955, 94 S.Ct. 1968, 40 L.Ed.2d 305 (1974).

 Appellant's contentions with regard to the applicability of collateral estoppel and law of the case principles to the initial transfer of venue to St. Paul are entirely without merit. Collateral estoppel prevents the relitigation of an issue previously determined between parties or their privies. See Ashe v. Swenson, 397 U.S. 436, 443–44, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469, 475–76 (1969). The venue of the superseding indictment was not such an issue. As previously noted, the theory of one continuous prosecution against Crow Dog has been rejected. The only issue determined by the prior transfer order was that a fair trial could not be held in the District of South Dakota at that point in time with regard to that particular indictment. Collateral estoppel is not applicable. Further, the principles of law of the case are inapplicable by virtue of similar reasoning. The selection of the transferee district was within the court's discretion under Fed.R.Crim.P. 21(a).

### III.

The next issues we consider relate to alleged deficiencies and errors in the discovery process attributable to the government. Appellant contends that the district court erroneously admitted evidence at trial which had not been properly disclosed to the defense prior to trial and further that the court erred in denying appellant's motion for a new trial based upon the discovery of purportedly exculpatory evidence which had been suppressed by the government in violation of the dictates of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Our examination of both these issues discloses no basis for relief.

---

**5.** A defendant is, of course, entitled to seek a transfer of venue subsequent to the filing of a superseding indictment and the dismissal of the original indictment on which transfer had been granted. In ruling on that motion, the court could take judicial notice of the evidence adduced at the previous hearing on the transfer issue and accord it whatever weight it sees fit. Such a motion was made in the instant case resulting in the transfer of the action to the Northern District of Iowa. Under Fed.R. Crim.P. 21(a) the court is not required to transfer the proceedings to the district specified in defendant's motion.

Appellant argues initially that the admission of certain evidentiary "surprises" by the government fatally tainted the trial and conviction. That evidence included testimony by two of the postal inspectors with regard to actions and statements by appellant Crow Dog during the Wounded Knee confinement which had not been previously revealed. This evidence included inconsistencies with and additions to prior statements made by the inspectors as to the role played by the appellant during the incident. Further, the government introduced at trial a picture of Crow Dog's co-defendants which had not been shown to defense counsel prior to that time. Although the United States Attorney supplied defense counsel prior to trial with a ten-page general narrative statement outlining the prosecution's evidence, it is alleged that the failure to disclose these specific items of evidence should have rendered them inadmissible at trial. We disagree.

■ Discovery matters are committed to the sound discretion of the district court and are reviewable only upon an abuse of that discretion. *United States v. Swanson*, 509 F.2d 1205, 1209 (8th Cir. 1975); *United States v. Cole*, 453 F.2d 902, 905 (8th Cir.), *cert. denied*, 406 U.S. 922, 92 S.Ct. 1788, 32 L.Ed.2d 122 (1972). It is well established that

an error in administering the discovery rules is not reversible absent a showing that the error was prejudicial to the substantial rights of the defendant.

*United States v. Cole, supra*, 453 F.2d at 904.

■ In the instant case appellant makes no specific contention as to any prejudice which flowed from the nondisclosure of these evidentiary specifics, nor is any prejudice apparent from the record. We note that the photograph in question appeared in a local newspaper at the time of the incident and was easily obtainable by the defense. With regard to the postal inspectors' "surprise" testimony, the record reveals that the inspectors were thoroughly cross-examined as to variances in their recollections of Crow Dog's participation in the

alleged crimes. While defense counsel contends they were surprised by certain portions of testimony, at no time was a continuance sought on that basis. Since no showing of prejudice has been made, we find no abuse of the district court's discretion in admitting this evidence over defense objections.

■ A more difficult question is presented with regard to appellant's allegation that the government failed to disclose exculpatory evidence to the defense in violation of the dictates of *Brady v. Maryland, supra*. The evidence in question consists of a group of photographs which were allegedly shown to the postal inspectors by FBI agents at Pine Ridge, South Dakota, very shortly after the inspectors had been released by the Indians. It is claimed that the postal inspectors were unable to identify any of the defendants in these photographs. Our careful examination of the record in this case convinces us, however, that nondisclosure of these photographs did not constitute reversible error. The existence and content of the photographs described by defense counsel are open to serious doubt. But even assuming the photographs' existence, their use would have been confined to minimal impeachment purposes and thus they were not sufficiently material to the issue of innocence or guilt to require reversal or remand of this case.

It appears from the record that the inspectors were shown a "stack of photographs" on the day of the incident in the FBI headquarters at Pine Ridge, South Dakota, and that they did not at that time identify appellant Crow Dog or either of the co-defendants from those pictures. However, these photos have never been specifically identified by the government. The prosecution represented to the trial court and to this court that there was no record kept as to which pictures or photos were shown to the inspectors at that time. Based upon photographs which were known to be available to the FBI agents at the place and time in question, the government stated that the pictures were probably of persons who had been arrested during inci-

dents in Custer and Rapid City, South Dakota. Since Crow Dog was not arrested on either of those occasions, there would be no picture of him among the group. Thus, those photographs would be of no particular use in his defense.

Appellant's counsel contends, however, that there is a very high probability that Crow Dog is among those pictured in the heretofore unidentified photographs. Further, he alleges here, as he did in a post-trial motion to the same effect in the trial court, that a series of events unrelated to this litigation gave him knowledge of the existence of some 60 photographs contained in two named FBI files which were, he believes, the ones shown to the inspectors following their release. Appellant does not believe that the pictures were merely mug shots of persons arrested at those two incidents. Rather, he believes that they were taken at the scene on those two dates and, given appellant Crow Dog's prominent role in those incidents, there existed a substantial probability that he would be pictured in one or more of the photographs. No hearing was conducted by the district court on this issue. However, the court in its August 4, 1975, order stated that the motion for post-trial relief on *Brady* grounds did not "set forth a sufficient basis relevant to the cases at bar to warrant a new trial." 399 F.Supp. at 242. Appellant now contends that the nondisclosure of the photographs, following the request that they be produced, constituted a *Brady* violation which requires that a new trial be granted. At the very least, it is urged that Crow Dog is entitled to an evidentiary hearing at which the photographs could be viewed and their prior use, if any, for identification purposes could be ascertained.

Initially, we note that appellant's contention that he is among those pictured in the photographs allegedly shown to the inspectors is highly speculative and based upon very thin evidence. The FBI 302 report, which came into the hands of appellant Crow Dog's attorney in connection with a wholly unrelated criminal matter, refers to a stack of 60 photographs which the agent viewed at the FBI command post in Pine Ridge, South Dakota, on the afternoon of March 11, 1973, the same day and time that the postal inspectors were there viewing photographs. The agent's report, written on the date of that incident, states that he looked at photos "of individuals who had been arrested at Custer, South Dakota, on February 6, 1973, and in Rapid City, South Dakota, on February 9, 1973." The prosecution has in this action consistently maintained that it was these same arrest photographs that were shown to the postal inspectors that day. Our examination of the affidavits and the other materials presented to the district court convinces us that it is entirely plausible, if not probable, that the photographs shown to the inspectors were mug shots of persons arrested in those two earlier incidents and did not include appellant Crow Dog. Given the highly speculative nature of the allegations raised by appellant Crow Dog in his post-trial motion, we do not believe that the district court erred in failing to hold a post-trial evidentiary hearing on this matter.

Even assuming, arguendo, that appellant's contentions with regard to the photographs would be sufficient under ordinary circumstances to require a hearing, it is our view that a remand for a hearing in this case would serve no useful purpose. Careful examination of the record convinces us that the evidentiary use of the photographs could not have constituted the type of exculpatory evidence which would have required the granting of a new trial under *Brady* standards.

 In *Evans v. Janing*, 489 F.2d 470, 474–78 (8th Cir. 1973), this court fully explored the *Brady* standards and adopted the three-pronged test from *Moore v. Illinois*, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972), for use in testing a claimed violation of due process on these grounds. Under that test the relevant factors are "(a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence." 408 U.S. at 794–95, 92 S.Ct. at 2568, 33 L.Ed.2d at 713. *See*

*Ogden v. Wolff*, 522 F.2d 816 (8th Cir. 1975). *See generally United States v. Librach*, 520 F.2d 550 (8th Cir. 1975); *United States v. Agurs*, 167 U.S.App.D.C. 28, 510 F.2d 1249, 1252–54 (1975).

 The first prong of the *Moore* test was met in the instant case. Sufficient request was made for all exculpatory evidence prior to trial and the specific photographs in question were sought by counsel during the trial. However, there is no evidence in the record to support a finding that the prosecutor deliberately and in bad faith suppressed these photographs. Rather, the suppression here, if any, appears at most to be in the realm of negligent nondisclosure. As such, the appellant must provide "some showing of fundamental unfairness as a result of the suppression in order to merit relief." *Ogden v. Wolff, supra,* 522 F.2d at 821.

With regard to the second prong of the *Moore* test, it was noted by this court in *Evans v. Janing, supra,* 489 F.2d at 476, that information indicating the failure of a witness to identify the defendant would be "potentially useful to the defendant and therefore favorable to his defense." The slight burden under this element of the test is easily satisfied here.

The third prong, the materiality of the suppressed evidence, is the most difficult test to satisfy under *Moore*. Appellant contends that the suppressed photographic evidence, assuming that Crow Dog is pictured therein, is highly material to the issues of the allegedly tainted in-court identification of Crow Dog and the general credibility of the inspectors. We do not agree inasmuch as appellant Crow Dog's presence in Wounded Knee at the time in question is not in serious dispute.

In our view the nature of the suppressed evidence is such that it could not have been used by skilled counsel to develop "a reasonable doubt [of guilt] in the minds of enough jurors to avoid a conviction." *Shuler v. Wainwright,* 491 F.2d 1213, 1223 (5th Cir. 1974) *quoting from United States v. Miller,* 411 F.2d 825, 832 (2d Cir. 1969). *See also Ogden v. Wolff, supra,* 522 F.2d at 822;

*Evans v. Janing, supra,* 489 F.2d at 477 & n.19; *United States v. Kahn,* 472 F.2d 272, 289 (2d Cir.), *cert. denied,* 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973). A review of the record in the instant case fully illustrates the limited utility this evidence would have had at trial.

Appellant's claim of materiality with regard to in-court identifications of him by the postal inspectors is apparently based upon his belief that with the addition of the suppressed photographic evidence the court would have found that the in-court identifications were so tainted as to preclude their reliability. *See Neil v. Biggars,* 409 U.S. 188, 196–201, 93 S.Ct. 375, 380–383, 34 L.Ed.2d 401, 409–412 (1972); *Simmons v. United States,* 390 U.S. 377, 382–86, 88 S.Ct. 967, 970–972, 19 L.Ed.2d 1247, 1252–1255 (1968). *See generally United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). In our view the record of the thorough taint hearings conducted by the trial court as to each inspector adequately rebuts this charge and supports the district court's conclusion that an independent basis for identification existed in each instance.

Similarly, the suppressed identification evidence could not have had such a major bearing on the credibility of the postal inspectors as to require a new trial under *Brady* standards. Appellant argues on this appeal that his identification "as the person who committed certain acts is the key issue in this case." We agree. However, we do not agree with appellant's statement that the suppressed evidence "is material to the question of innocence or guilt and should be presented to the jury."

It is readily apparent from the record that the identification of appellant Crow Dog as being a person who was in the museum at some time during the course of the postal inspectors' detention is beyond question. Nor does there seem to be any significant doubt concerning the fact that Crow Dog lectured the postal inspectors during their captivity on a variety of issues relating to Indian problems. The entire thrust of Crow Dog's trial defense was

predicated on the contention that he could not be found guilty of aiding and abetting a robbery on evidence that merely established that he came in and gave a speech. This point was emphasized by counsel for Crow Dog in his opening statement and closing arguments to the jury. Further, defense counsel stated to this court in oral argument that he did not believe that Crow Dog's presence within the museum in the role of a lecturer was "an issue."

■ Thus it seems clear that the suppressed evidence would not have proved or disproved appellant Crow Dog's presence at the scene of the incident. Instead, appellant would have used the suppressed evidence for the purpose of impeaching the postal inspectors with respect to their subsequent identification of Leonard Crow Dog as a man who did certain acts in addition to lecturing while inside the museum. The in-court identification of Leonard Crow Dog at the scene by the postal inspectors was strong and not seriously questioned. However, there were contradictions and inconsistencies in their testimony on the issue of Crow Dog's role in the incident. These areas were fully explored in lengthy cross-examination by all three able defense attorneys. In many respects, the claimed suppressed identification evidence would have been cumulative. In any event, the evidence could not have played a determinative role in the outcome of the trial. It was not sufficiently material on the ultimate question of guilt or innocence so that its suppression constituted a violation of due process. See Giglio v. United States, 405 U.S. 150, 153–54, 92 S.Ct. 763, 765–766, 31 L.Ed.2d 104, 108 (1972); Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217, 1220 (1959).

In conclusion, we find that while there may have been a negligent nondisclosure by the prosecution of favorable evidence following the request by the defense for production of same, the evidence in question completely fails to satisfy the materiality standards required by Moore and therefore does not warrant further hearing or the granting of a new trial on the basis of a violation of due process.

## IV.

The next contention raised by appellant is that he was denied his right to speedy indictment and trial as guaranteed by the Fifth and Sixth Amendments and by Fed.R. Crim.P. 48(b). We disagree.

■ It is alleged that the period between Crow Dog's initial indictment on April 10, 1973, and the commencement of trial on June 2, 1975, constituted a delay sufficient to require dismissal of the indictment pursuant to the guidelines established by the Supreme Court in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The "ad hoc" balancing test from Barker requires consideration of the following factors in determining whether a constitutional violation has occurred: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." Barker v. Wingo, supra, 407 U.S. at 530, 92 S.Ct. 2192, 33 L.Ed.2d at 117 (footnote omitted). The delay in the instant case, when viewed in light of these factors, was not constitutionally fatal.

We find initially that the length of the delay in the instant case is sufficient to trigger further inquiry. It should be noted, however, that the complexity of the Wounded Knee cases generally serves to justify a somewhat longer delay than would ordinarily have been permitted prior to a finding that the defendant had been presumptively prejudiced. See Barker v. Wingo, supra, 407 U.S. at 530, 92 S.Ct. at 2191, 33 L.Ed.2d at 116.

The second factor, the reason for the delay, does not weigh heavily in the balancing process for or against either side in this case. Rather, our examination reveals that the delay was occasioned by primarily "neutral" factors. See Barker v. Wingo, supra, 407 U.S. at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117.

It is important to keep in mind the fact that the sheer magnitude of the Wounded Knee incident placed a heavy burden on the federal courts responsible for the prosecu-

tions arising therefrom. Allocation of manpower and resources was of no little concern to both the prosecution and the defense in their preparation. In addition, the logistics of bringing to trial a large number of persons on a wide variety of charges required a more protracted period for discovery and pretrial matters than would normally be expected. Further, the nine-month trial of Dennis Banks and Russell Means after denial of the motion to consolidate necessarily postponed the non-leadership trials. For example, defense counsel for Crow Dog in this action was counsel for Russell Means in that trial and the resultant appeal process. Finally, the government's acquisition of a superseding indictment against Crow Dog in December 1974 on substantive charges which were not previously brought required that further preparation time be allowed to both sides. We note that a speedy trial was had on those substantive charges with less than seven months elapsing between the time of the superseding indictment and the conviction of appellant Crow Dog which is now on appeal.

We have taken into consideration all of these factors in analyzing the reason for the delay. While responsibility for the delay appears to rest in some measure on both the prosecution and defense, we realize that the government must ultimately bear the greater share. However, it is clear that, to the extent the government is responsible for the delay, it was not done in "an attempt to gain a tactical advantage over the defendant or to harass him." *United States v. Jackson*, 508 F.2d 1001 (7th Cir. 1975). Thus, on balance, we are not inclined to give this factor great weight for or against either side in determining whether or not a denial of speedy trial has taken place.

Appellant has also failed to satisfy the remaining two *Barker* elements. First, there was no clearly articulated assertion of defendant's right to a speedy trial. Appellant contends that his motion to consolidate contained language which was tantamount to such a request, in that it stated that unless consolidation was granted Crow Dog and the other non-leadership defendants would be denied that right. The trial court, in its discretion, denied the motion. No subsequent demand for a speedy trial was made by Crow Dog. Nor did defense counsel express any particular interest in separate simultaneous trials of all Wounded Knee defendants. To have done so, it is now contended, would have been inconsistent with concepts of due process and fairness. Under these unusual circumstances we find no active assertion of the right to a speedy trial by appellant Crow Dog. A request for a speedy trial will not be inferred from a set of facts such as these which indicate that the desire for a prompt trial was conditioned upon a grant of the consolidation motion.

Finally, we are unpersuaded that any cognizable prejudice has occurred to Crow Dog as a result of the delay. The Supreme Court in *Barker* specified that the three major concerns in this area of prejudice were "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118 (footnote omitted). Appellant Crow Dog was free on bond throughout the entire pendency of this action and thus has no claim based on oppressive incarceration. It is claimed, however, that his preparation of an effective defense was impeded by the passage of time. This contention is wholly unmeritorious. The discovery taken by the Wounded Knee Legal Defense/Offense Committee was, from its inception, for the benefit of all defendants in criminal actions arising out of the Wounded Knee incident. Appellant admits in his brief that much of the testimony offered against him at his trial had been previously given at the Means/Banks trial. Any "fading of memories" could have been revived and refreshed by those prior transcripts.

As to the August 1974 death of Angel Martinez, an eyewitness to the events in the museum, we conclude that any claim of resultant prejudice is based entirely on

speculation. The record before this court does not indicate what Martinez' testimony would or could have been. Where, as here, no specific claim of prejudice is made and where eyewitness testimony abounds,[6] the fact that a possible witness died during the delay will not be weighed heavily in the balance.

Thus, appellant Crow Dog is confined to a claim of general prejudice arising from the strain of being under indictment and subject to the possibility of a lengthy prison term. However, that allegation by itself "does not establish prejudice where, as here, the defendant neither asserts nor shows that the delay weighed particularly heavily on him in specific instances." *Morris v. Wyrick*, 516 F.2d 1387, 1391 (8th Cir. 1975). *See also United States v. Baumgarten*, 517 F.2d 1020, 1025 (8th Cir. 1975); *United States v. Cummings*, 507 F.2d 324, 330 (8th Cir. 1974).

 After careful consideration of the four factors from *Barker*, we are satisfied that no denial of the right to a speedy trial occurred in the instant case.

 Appellant further alleges that his rights under the Fifth Amendment were denied by virtue of the delay in issuing the superseding indictment. *See United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). This claim is without merit. The standard employed in determining whether prejudice has taken place as a result of pre-indictment delay is "whether the delay has impaired the defendant's ability to defend himself." *United States v. Golden*, 436 F.2d 941, 943 (8th Cir.), *cert. denied*, 404 U.S. 910, 92 S.Ct. 236, 30 L.Ed.2d 183 (1971). *See also United States v. Jackson*, 504 F.2d 337 (8th Cir. 1974), *cert. denied*, 420 U.S. 964, 95 S.Ct. 1356, 43 L.Ed.2d 442 (1975). We agree with the district court's finding that there has been no showing to substantiate appellant's claim of prejudice or intentional delay. *See United States v. Jackson, supra*, 504 F.2d at 339 n.2; *United States v. Rucker*, 496 F.2d

1241, 1242–44 (8th Cir. 1974). Although the superseding indictments were not handed down until some 20 months after the incident, Crow Dog had been under indictment for a crime encompassing the same set of events during almost that entire period. Any defense efforts made in regard to that first indictment carried over to the second and thus negated the chance of an impaired defense. The district court's finding in this regard is not clearly erroneous. *United States v. Jackson, supra*, 504 F.2d at 341.

 Similarly unmeritorious is appellant's contention that the district court erred in failing to dismiss his case for want of prosecution under Fed.R.Crim.P. 48(b). That rule gives the court discretion to dismiss an indictment for unnecessary delay even if no Sixth Amendment violation is found. *See United States v. Clay*, 481 F.2d 133, 135 (7th Cir.), *cert. denied*, 414 U.S. 1009, 94 S.Ct. 371, 38 L.Ed.2d 247 (1973). This court has held, however, that most of the same factors which are relevant for Sixth Amendment purposes are applicable to Rule 48(b) motions. *See Hodges v. United States*, 408 F.2d 543, 551 (8th Cir. 1969). Having already discussed the *Barker* standards at length and found no denial of Sixth Amendment rights, we conclude that the district court's denial of a dismissal pursuant to Rule 48(b) was not an abuse of discretion. *See Hodges v. United States, supra*, 408 F.2d at 551.

V.

We next review appellant's claim that the evidence presented against him at trial was insufficient as a matter of law to sustain his conviction as an aider and abettor. It is asserted that the government's testimony failed to show that Crow Dog did any affirmative act to further the accomplishment of the criminal acts charged, namely, robbery of a pistol belonging to the United States and intimidation of and interference with the performance of duties by a federal postal inspector. In evaluating this contention, we are guided by the principle that

6. The transcripts reveal that during the period of the postal inspectors' captivity somewhere between 40 and 50 spectators were in or near the museum.

this court must view the evidence in the light most favorable to the verdict and accept all reasonable inferences that flow therefrom. *United States v. Baumgarten,* 517 F.2d 1020, 1026 (8th Cir. 1975); *United States v. Wiebold,* 507 F.2d 932, 933 (8th Cir. 1974); *United States v. Britton,* 500 F.2d 1257, 1258 & n.4 (8th Cir. 1974); *Koolish v. United States,* 340 F.2d 513, 519 (8th Cir.), *cert. denied,* 381 U.S. 951, 85 S.Ct. 1805, 14 L.Ed.2d 724 (1965).

■ Applying that standard to the instant case, we find that the evidence is sufficient to support appellant Crow Dog's conviction on both counts. Aiding and abetting requires proof by the government that the defendant had a "purposeful attitude" and in some manner participated in the unlawful deed. *United States v. Hill,* 464 F.2d 1287 (8th Cir. 1972); *United States v. Kelton,* 446 F.2d 669, 671 (8th Cir. 1971); *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir. 1938). *See also United States v. Atkins,* 473 F.2d 308, 310–13 (8th Cir.), cert. denied, 412 U.S. 931, 93 S.Ct. 2751, 37 L.Ed.2d 160 (1973). Essentially, this requires the existence of "some affirmative participation which at least encourages the perpetrator." *United States v. Thomas,* 469 F.2d 145, 147 (8th Cir. 1972). *See also United States v. Wiebold,* 507 F.2d 932, 934 (8th Cir. 1974). *United States v. Baumgarten, supra,* 517 F.2d at 1027. *See also Perriea v. United States,* 347 U.S. 1, 9, 74 S.Ct. 358, 363, 98 L.Ed. 435, 444 (1954); *Nye & Nissen v. United States,* 336 U.S. 613, 618–19, 69 S.Ct. 766, 769, 93 L.Ed. 919, 924–25 (1949).

■ Evidence was presented in this case which showed that appellant Crow Dog (1) met the postal inspectors outside the museum building in which they were subsequently held and informed them that they were "prisoners of war" and would be treated accordingly; (2) entered the building with the inspectors and repeated the

prisoner of war statement to them as they were being bound and gagged; (3) lectured the captive inspectors on the problems of Indian people in the areas of health and education; [7] (4) warned that the inspectors might be carrying concealed recording or radio transmitting equipment on their bodies and that they should be searched; and, (5) took keys to a locked briefcase from one of the inspectors. We feel that this evidence provides sufficient support for the jury's finding that Crow Dog aided and abetted the commission of the crimes charged.

The fact that the testimony of the postal inspectors contains various minor inconsistencies regarding the precise role played by appellant Crow Dog does not require a contrary result. The resolution of any such inconsistencies and contradictions is left to the jury. Likewise, the matter of the identification of Crow Dog by the inspectors, discussed *supra* in another context, was fully ventilated before the jury and committed to them for ultimate determination. *See Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704 (1942).

### VI.

The next issue which we consider is appellant's allegation that he was the victim of discriminatory and bad faith prosecution and governmental misconduct. A motion to dismiss was filed in the district court prior to trial based on these same reasons. In a post-trial order entered on August 4, 1975, the district court held that, after careful examination of the voluminous record in this case and in the other Wounded Knee cases, these contentions by appellant Crow Dog were not substantiated. 399 F.Supp. at 234–38. We agree.

■ As recently stated by this court in *United States v. Swanson,* 509 F.2d 1205, 1208 (8th Cir. 1975):

---

7. Appellant contends, somewhat imprecisely, that the act of lecturing would not have provided a sufficient basis in and of itself to support his conviction as an aider and abettor, especially with regard to the alleged act of robbery. By virtue of the fact that there is other evidence in the record from which Crow Dog's active role in the incident can be inferred, we need not reach this question. It is our view, however, that appellant Crow Dog's act of speech loses its First Amendment protection when coupled with criminal activity.

It is well established that a reasonable prosecutorial discretion is inherent in our judicial system, *United States v. Wiley*, 503 F.2d 106, 107 (8th Cir. 1974), and that such discretion does not amount to unconstitutional discrimination unless it is deliberately based upon an unjustifiable standard such as race, religion or other arbitrary classification, *United States v. Alarik*, 439 F.2d 1349 (8th Cir. 1971). Further, we are guided by the principle that "[t]he presumption is always that a prosecution for violation of a criminal law is undertaken in good faith and in nondiscriminatory fashion for the purpose of fulfilling a duty to bring violators to justice." *United States v. Falk*, 479 F.2d 616, 620 (7th Cir. 1973) (en banc).

In order to overcome this presumption the defendant bears the burden of proving that he was singled out for prosecution while others similarly situated were not indicted, and that the decision to prosecute him was in bad faith and based upon impermissible considerations. These two essential elements are sometimes referred to as "intentional and purposeful discrimination." *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974). *See also United States v. Swanson, supra*, 509 F.2d at 1208–09; *United States v. Ortega-Alvarez*, 506 F.2d 455, 458 (2d Cir. 1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1559, 43 L.Ed.2d 775 (1975); *Tollett v. Laman*, 497 F.2d 1231, 1233 (8th Cir.), *cert. denied*, 419 U.S. 1088, 95 S.Ct. 678, 42 L.Ed.2d 680 (1974).

The record in the instant case fails to disclose any such impermissible motive on behalf of the prosecution. At the hearing which was held by the district court on this issue, evidence was presented which showed (1) that the conviction rate in Wounded Knee cases was significantly lower than the national average; (2) that non-AIM members have not been prosecuted for violent criminal conduct, nor have incidents of violence involving those persons been meaningfully investigated; and, (3) that non-AIM Indians who participated in a roadblock incident similar in some respects to the case at bar were not prosecuted.

The trial court carefully analyzed all of the evidence, including FBI investigatory files, and concluded that "defendants' three categories of evidence, neither individually nor cumulated, show an intentional selection of these defendants for prosecution based on their affiliation with and activities in the American Indian Movement." 399 F.Supp. at 236. The record in the instant case is devoid of any evidence which indicates that appellant Crow Dog was intentionally singled out for prosecution. Accordingly, we uphold the order of the district court denying defendant's motions to dismiss on this basis.

Appellant's argument regarding alleged governmental misconduct is similarly without merit. It is contended that the activities of the government outlined by the court in *United States v. Banks*, 383 F.Supp. 389, 393–97 (D.S.D.1974) have been carried over into this case. Specifically, appellant Crow Dog decries the use of informants placed in the defense camp by the government, the resulting cover-up of that use, and the failure by the government to comply with various pretrial discovery orders. He contends that these acts amounted to a deprivation of due process and an abuse of the judicial system which requires a reversal of the conviction and a dismissal of the indictment.

Accusations such as these are, of course, a serious matter. Courts must guard against the abuse of the judicial process. As stated by the Supreme Court in *McNabb v. United States*, 318 U.S. 332, 340, 63 S.Ct. 608, 613, 87 L.Ed. 819, 824 (1942), "[j]udicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence." *See also Communist Party v. Subversive Activities Control Board*, 351 U.S. 115, 124, 76 S.Ct. 663, 667, 100 L.Ed. 1003, 1009 (1956). In discharging this supervisory function the courts have the latitude to fashion remedies that include those sought in the instant case. However, the court in *United States v. McCord*, 166 U.S.App.D.C. 1, 7, 509 F.2d

334, 348–51 (1974) (en banc), *cert. denied,* 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87 (1975), while noting that "serious prosecutorial misconduct may so pollute a criminal prosecution as to require dismissal of the indictment or a new trial, without regard to prejudice to the accused," *id.* at 349, also recognized that the desire to deter prosecutorial misconduct "does not eliminate consideration of prejudice [to the accused] altogether." *Id.* at 350. The record in the instant case fails to disclose that *any* prejudice accrued to appellant Crow Dog by virtue of the alleged acts of government misconduct and therefore we find no basis for relief.

▆ The trial court analyzed the alleged instances of misconduct, specific and general, which were presented by the appellant. It found that the majority of the incidents took place during the trial of other Wounded Knee defendants, especially AIM leaders Dennis Banks and Russell Means. No attempt was made to prove that any prejudice to this defendant resulted from those incidents. In the absence of such proof, it will not be presumed that the misconduct of the government in one case carries over to another case.

▆ There is one instance of alleged government misconduct which merits special attention in this case. Appellant has alleged here and in other recent cases before this court that the presence in the Wounded Knee defense camp of an operative paid by the government constituted a denial of due process in that it subverted the attorney-client relationship. Our examination of the record in this case shows conclusively that no such denial of Crow Dog's rights occurred.

The informant, Douglas Durham, had worked in various undercover capacities prior to the Wounded Knee incident. His relationship with the FBI began in March 1973 when he supplied the FBI office in Des Moines, Iowa, with copies of photographs he had taken in a one-day visit to Wounded Knee. He later served in various leadership positions within AIM, including national security director and national administrator.

He became a close companion of AIM leader Dennis Banks during the period including the Banks-Means trial in St. Paul. Throughout this period of intimate affiliation with AIM and its leaders he was supplying information to the FBI.

Appellant Crow Dog contends that Durham had access to the legal files prepared by the Wounded Knee Legal Defense/Offense Committee that represented him and most other persons charged in Wounded Knee related incidents. It is further alleged that Durham was present at conferences between the attorneys and clients in St. Paul during the Banks-Means trial and during other such conferences in Lincoln, Nebraska, in January 1975. These conferences allegedly included discussion of legal matters and defense strategy common to all Wounded Knee defendants, thus affording Durham the opportunity to reveal such plans to the FBI and federal prosecutors. Appellant contends that this activity constituted gross misconduct requiring reversal of his conviction in accordance with the principles established in *Hoffa v. United States,* 385 U.S. 293, 306–08, 87 S.Ct. 408, 415–16, 17 L.Ed.2d 374, 384–85 (1966), and *South Dakota v. Long,* 465 F.2d 65, 71–72 (8th Cir. 1972), *cert. denied,* 409 U.S. 1130, 93 S.Ct. 951, 35 L.Ed.2d 263 (1973). We disagree.

We have carefully studied the record in this case and have viewed the FBI files on Durham which were examined by the district court *in camera.* There is no evidence in the record that Durham was present during the discussion of any defense strategy relevant to appellant Crow Dog's trial nor is there any indication that he passed on any such information to the FBI. Further, by the time of Crow Dog's trial in June 1975 Durham had been exposed as an informant.

▆ The record here merely indicates that during the period of Durham's service as an informant for the FBI he occupied various leadership positions within AIM and was a confidant of Dennis Banks. Any close proximity with appellant Crow Dog is

neither alleged nor apparent from the record. No prejudice to appellant has been shown to arise from this tangential relationship with his case. We adopt the position that in the absence of a showing of actual prejudice:

> [T]here must be the actual gaining, rather than the mere opportunity for gaining, of information relative to a charge against [a] defendant, and the information must be obtained by the informant from an intrusion into the attorney-client relationship.

*United States v. Cooper,* 397 F.Supp. 277, 285 (D.Neb.1975). No such "gaining" or "intrusion" has been shown in the instant case.

### VII.

The two remaining issues raised by appellant Crow Dog on this appeal are of little merit and are entitled to only summary consideration. The first argument involves the refusal by the trial court to allow individualized voir dire of the prospective jurors outside the presence of each other. A motion to this effect was made by defense counsel and denied by the court. Appellant alleges that the nature of this case, the publicity that surrounded the Wounded Knee incident, and the racial prejudice that exists generally against American Indians necessitated that this extra protective measure be taken in order to assure a fair trial.

We note initially that pursuant to Fed.R.Crim.P. 24(a) the trial judge in his discretion may permit the attorneys in an action to ask questions of individual prospective jurors. In the instant case the court afforded great latitude to defense counsel in their questioning. One full day was spent selecting the jury. The entire trial, including the voir dire, lasted only three and one-half days. Each potential juror was carefully examined as to his or her exposure to the Wounded Knee incident through the media and was thoroughly questioned as to possible prejudice against Indians. Such in-depth probing of individual jurors fully comported with the standards laid down in this court's recent decision in *United States v. Bear Runner,* 502 F.2d 908, 912–13 (8th Cir. 1974). Refusal to allow individual, segregated voir dire was not an abuse of the trial court's broad discretion in this area. *See United States v. Bear Runner, supra,* 502 F.2d at 911.

Finally, appellant charges that the intentional failure by the government to have the grand jury testimony of law enforcement personnel recorded constituted error. This court has consistently held that "there is no constitutional or statutory requirement that grand jury testimony be recorded." *United States v. Biondo,* 483 F.2d 635, 641 (8th Cir. 1973), *cert. denied,* 415 U.S. 947, 94 S.Ct. 1468, 39 L.Ed.2d 563 (1974). *See also United States v. Arradondo,* 483 F.2d 980, 984 (8th Cir. 1973), *cert. denied,* 415 U.S. 924, 94 S.Ct. 1428, 39 L.Ed.2d 480 (1974); *United States v. Harflinger,* 436 F.2d 928, 930 (8th Cir. 1970), *cert. denied,* 402 U.S. 973, 91 S.Ct. 1660, 29 L.Ed.2d 137 (1971). *But see United States v. Thoresen,* 428 F.2d 654, 666 (9th Cir. 1970); *United States v. Cianchetti,* 315 F.2d 584, 591 (2d Cir. 1963). We see no reason to depart from our holdings in the instant case.

In summary, we find that appellant Crow Dog has failed to assert any basis for the reversal of his conviction in the instant case. The trial court afforded defendants and defense counsel great latitude in the course of the trial. In the absence of any showing of prejudicial error or abuse of discretion by the trial court, appellant Crow Dog's convictions on both counts must be affirmed.

LAY, Circuit Judge (concurring).

I concur in Judge Stephenson's thorough opinion. However, I feel the time has come for district courts to adopt local rules requiring the government to record grand jury testimony of law enforcement personnel. Although there may be no constitutional or statutory requirement that grand jury testimony be recorded, nonetheless this court has cautioned that the better practice is to record and transcribe the minutes of

all proceedings of the grand jury which are accusatorial in nature. *See United States v. Arradondo,* 483 F.2d 980 (8th Cir. 1973), *cert. denied,* 415 U.S. 924, 94 S.Ct. 1428, 39 L.Ed.2d 480 (1974). As Judge Bright there stated:

> We note that failure of prosecutors to record significant testimony before the grand jury serves to thwart the right of the defendant under a showing of "particularized need" . .. . to obtain grand jury testimony of a trial witness.

483 F.2d at 985 n. 4.

Since we have not previously made it a court rule to record grand jury testimony, I do not vote for reversal here. However, I think that the time for that rule has arrived.