UNITED STATES of America,
Appellee,

v.

Burton A. LIBRACH, Appellant.

No. 75–1153.

United States Court of Appeals,
Eighth Circuit.

Submitted June 12, 1975.

Decided July 30, 1975.

Lawrence J. Fleming, St. Louis, Mo., for appellant.

Barry Short, Asst. U. S. Atty., St. Louis, Mo., for appellee.

Before GIBSON, Chief Judge, WEBSTER, Circuit Judge, and DEVITT, Chief District Judge.[*]

GIBSON, Chief Judge.

The defendant, Burton A. Librach, was convicted by a jury of filing a false claim and using a false document to obtain an urban renewal relocation payment of $9,700 from the Department of Housing and Urban Development (HUD), in violation of 18 U.S.C. § 1001 (1970). He was sentenced to six months confinement on count I and 2 years probation to be served consecutively on count II.

On appeal defendant asserts as error (1) the court's refusal to grant a new trial based on prosecutorial suppression of favorable evidence, (2) the court's failure to dismiss the case because of prosecutorial delay in bringing the indictment,

[*] The Honorable Edward J. Devitt, Chief Judge, United States District Court for the District of Minnesota, sitting by designation.

(3) admission of allegedly illegal testimony, (4) a procedural ruling allowing the Government to lead its own witness and attempt to refresh the recollection of that witness, and (5) imposition of sentence under the general felony fraud statute, § 1001, rather than the more specific HUD misdemeanor statute, 18 U.S.C. § 1012 (1970). We believe the defendant was denied a fair trial by the Government's suppression of evidence material to impeach its key witness, Robert Fowler, and thus reverse and remand for a new trial. Since defendant is subject to a retrial, we also pass upon the other assertions of error.

Defendant Librach, an attorney, was accused of filing a false claim in August, 1969, for expenses fictitiously incurred in relocating the furniture of the Windemere Hotel from the West End Urban Renewal Area of St. Louis, Missouri, to two buildings known as the Kingsbury Court Apartments owned by him in the same vicinity. The Windemere Hotel was owned by Librach's stepmother, Peppi Librach, who was too ill to participate in the trial. The defendant filed the claim as her attorney.

Librach obtained the funds from the St. Louis Land Clearance Redevelopment Authority (LCRA), a quasi-municipal agency under contract with HUD. Mrs. Librach was entitled under the LCRA program to a small business displacement award of $2,500 and reimbursement for her expenses in relocating the hotel. The defendant is charged with fraudulently obtaining $9,700 reimbursement for moving expenses never incurred. The furniture contained in the 64 rooms of the Windemere Hotel was not moved to the defendant's Kingsbury Court Apartments as he certified to HUD; rather, it was sold to one Richard Green for approximately $1,000. Green took possession of the furniture at the hotel and transported it himself at no cost to the defendant.

The Government's key witness was Robert Fowler, a business relocation specialist for LCRA at the time of the offense in 1969, who arranged the fraudulent transaction for personal gain. Fowler did not implicate the defendant when he was first interviewed under oath in May, 1974, but later he testified that he arranged the fraudulent payment with Librach's knowledge and connivance, receiving in return a kickback of $1,000. Fowler's implication of Librach was partly corroborated by Charles Ginsberg, a real estate broker who telephoned Librach in 1969 to submit Green's offer to buy the furniture. Librach accepted the offer, according to Ginsberg. Fowler was further corroborated by Sam Siegel, another real estate broker who accompanied Librach to Fowler's office to discuss the deal in 1969.

Fowler was in protective custody when he testified at trial and was informally granted immunity, apparently since he is chronically ill from sickle cell anemia. Six months prior to trial he reported threats on his life and was relocated with his wife and seven children to another state and paid $1,000 per month plus expenses. By the time of trial Fowler had received $9,947.65 in "subsistence maintenance and relocation payments" from the Government. Defense counsel first learned of the protective custody during the trial and was not informed of Fowler's support payments until several weeks after trial.

The defendant testified that he filed the LCRA claim as an agent accommodating his ailing stepmother who had left St. Louis to live with her daughter in Kansas City. Mrs. Librach, he claims, nevertheless dealt directly with Siegel and Heller, the realty firm managing the sale or relocation of the hotel. The defendant admitted going to Fowler's LCRA office at Siegel's request to sign papers concerning the move, but insists he signed only as Fowler instructed. He claims he did not know, and did not check to see, if the furniture had been moved but claims Siegel and Fowler told him it was. He disclaimed financial interest in the furniture and, though he

personally received the $12,200[1] LCRA payment in September, 1969, he remitted the entire amount to his stepmother in June, 1970. He admitted appropriating some of the funds for his own use during this interim period.

I. The defendant contends that Government suppression of favorable evidence denied him due process. In response to his discovery motion requesting all favorable evidence, filed five months before trial, the Government stated it had no favorable evidence but promised to disclose any that might arise later. He designates three items of evidence relevant to impeach the Government's key witness, Robert Fowler, which were suppressed. They are (1) the contradiction between Fowler's sworn pretrial statement that did *not* inculpate the defendant (disclosed three weeks before trial) and Fowler's later grand jury testimony that did (disclosed just prior to trial), (2) the fact that Fowler was placed in protective government custody beginning in June, 1974 (not disclosed until trial), and (3) the undisclosed fact that Fowler was paid nearly $10,000 during the six months from June, 1974, until after trial in January, 1975.

■ Defendant relies on the familiar rule that government suppression of favorable evidence material to the defense justifies a new trial irrespective of the good or bad faith of the prosecution. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Supreme Court reversed a conviction secured on a witness's false denial that the Government promised him leniency for his testimony. Therein it noted that the particular witness's reliability may have been determinative of guilt or innocence. The Court held that nondisclosure of evidence affecting the witness's credibility falls within the *Brady* rule, provided "the false [or suppressed] testimony could . . . in any reasonable likelihood

have affected the judgment of the jury . . . ." *Giglio v. United States, supra* at 154, 92 S.Ct. at 766, *quoting Napue v. Illinois,* 360 U.S. 264, 271, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

■ Application of these principles to the instant case calls for a new trial. This is an egregious case of prosecutorial suppression of evidence that was both favorable and material to the defense. *Evans v. Janing,* 489 F.2d 470, 475 (8th Cir. 1973). The Government's failure to disclose protective custody and its substantial payment of almost $10,000 to Robert Fowler obviously could have affected the jury's judgment of the witness's credibility. The circumstances were such that Fowler's testimony was the primary basis for determining Librach's guilt. The Government's paying a monthly subsidy to a witness is certainly a fact that should be disclosed to the trier of the facts since it is relevant to the witness's interest in testifying. Here, actually, Fowler's culpability is greater than that of the defendant. Fowler violated his public trust by fraudulently dispensing public funds. Yet the Government grants him immunity and a compensation of $1,000 a month plus expenses. Many observers may feel this is a strange way to enforce the criminal laws. Therefore, despite substantial evidence that Librach committed the crime charged, his due process rights to a fair trial have been violated and he is entitled to a new trial.

Fowler was the final witness on the first day of the two day trial. Defendant claims he did not discover that Fowler was in protective custody until the witness left the courtroom accompanied by two persons whom he recognized as Deputy United States Marshals. On inquiry, the prosecutor informed the defendant that Fowler was in protective custody but did not mention the payments nor describe the custody in any detail. Defendant did not recall Fowler for additional cross-examination concern-

---

1. The $12,200 figure includes $2,500 lawfully claimed as a relocation benefit and $9,700 fraudulently claimed for moving expenses.

ing his protective custody. However, it was not until several weeks after trial that he learned Fowler was receiving substantial Government support. And even then counsel learned of the financial support only inadvertently.[2]

We have no doubt that evidence of payments of nearly $10,000 to a witness in circumstances providing him an incentive to change his testimony is favorable and material[3] to the defense and that its suppression requires a new trial. This court cannot place its approval on the undisclosed payment of money to a government witness in these circumstances.[4] The Government's insistence that the suppression was inadvertent and that Fowler's friendly relationship with the prosecution was in fact partially disclosed, does not eliminate the need for reversal if the balance of the evidence suppressed "might reasonably have affected the jury's judgment on some material point." *United States v. Butler,* 16 Cr.L.Rep. 2345, 2346 (9th Cir. Dec. 18, 1974); *accord, United States v. Smith,* 480 F.2d 664 (5th Cir. 1973).

Applying this test to the instant facts it is significant that Fowler's credibility was crucial to the case against Librach and that suppression of the evidence might reasonably have affected the jury's judgment of his credibility. It was Fowler who directly testified that the defendant knew the furniture had not been moved when he filed the claim.

However, the Government's withholding of Fowler's contradictory grand jury testimony does not provide an additional basis for relief. Fowler's May 8, 1974, statement, produced three weeks before trial, was relatively innocuous considered alone. The same witness's inconsistent grand jury testimony incriminating the defendant was produced three days before trial and repeated during trial. It was not suppressed. Favorable pretrial statements or grand jury testimony by prospective government witnesses need not be disclosed until after the witness testifies at trial. *United States v. Eisenberg,* 469 F.2d 156, 160 (8th Cir. 1972), *cert. denied,* 410 U.S. 992, 93 S.Ct. 1515, 36 L.Ed.2d 190 (1973). The defendant's complaint that the withholding lulled him into a false sense of security concerning Fowler's testimony is unconvincing. Librach's counsel effectively cross-examined Fowler using the witness's prior inconsistent statements despite the short notice caused by the withholding. The defendant, moreover, did not request a continuance to allow additional time for trial preparation.

II. Defendant argues that he was denied due process by the delay of four years eleven months between the time of the offense and the filing of the

---

2. Fowler had testified that he was currently unemployed.

3. The higher standard of materiality required in a post-conviction case of evidence admissible only for impeachment, *Evans v. Janing, supra* at 477, *citing Link v. United States,* 352 F.2d 207, 212 (8th Cir. 1965), *cert. denied,* 383 U.S. 915, 86 S.Ct. 906, 15 L.Ed.2d 699 (1966), has no application in this direct appeal.

4. The Government's argument that the custody and support were not suppressed for the reason that the defendant had notice of them is not well taken. When the Government telephoned the defendant's attorney on June 20, 1974, to advise him that a witness's life had been threatened and that the witness was being placed under government protection, it did not identify Fowler by name.

Its additional argument that evidence of protective custody and support payments was un-

favorable to the defendant, or that he waived error by choosing not to recall and cross-examine Fowler after learning of the protective custody for fear that the Government would disclose the threats allegedly made on Fowler's life, is untenable as well. First, the Government concedes it had no factual basis with which to link the alleged threats to the defendant and to admit Fowler's report of the threats into evidence. Second, although the matter of protective custody because of reported threats to a witness can have unfortunate connotations against the defendant, whether or not the defendant desires the matter explained before a jury is a question that must be left up to him to decide. That the impact may be unfavorable to the defendant is no excuse for nondisclosure of the pertinent facts of protective custody to the defendant.

indictment. He acknowledges that this court has not yet reversed a conviction for pre-indictment delay but argues that the factors stated in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), apply here and justify dismissal. Resolution of this claim, however, arising under the Fifth Amendment Due Process Clause rather than the Sixth Amendment, requires a balancing of the reasonableness of the delay against the prejudice to the accused, if any. *United States v. Jackson,* 504 F.2d 337, 339 (8th Cir. 1974), *cert. denied,* 420 U.S. 964, 95 S.Ct. 1356, 43 L.Ed.2d 442 (1975).

The offense occurred August 14, 1969. The indictment was filed July 10, 1974. Defendant argues that the investigation was underway as early as February, 1972, when he was interviewed by the FBI. However, he argues he was not then informed he was a target of the investigation and thus had no notice. Consequently, he argues, he was unable to reconstruct past events to prepare his defense and lost the testimony of three witnesses: his stepmother, Peppi Librach, owner of the hotel, who is critically ill and suffers from impaired mental function and loss of memory; the accountant for the hotel, Max Rosenbaum, who died shortly before trial; and defendant's sister, June Rosen, who assisted in managing the hotel and who died in November, 1973.

The Government contends there has been no unreasonable delay. The United States Attorney became active in the case in May, 1974, when Siegel and Fowler appeared before the grand jury. The indictment was filed promptly thereafter. The defendant, it argues, had sufficient notice that the investigation was underway from his two 1972 FBI interviews and could have marshalled his defense then. Further, he did not demonstrate what evidence he might have obtained from the three lost witnesses.

The pre-indictment delay was not unreasonable in this case. The lapse in time between the offense and the indictment was understandable. Cases of fraud are difficult to develop. Corrobo-

rative evidence is difficult to secure and, of course, the participants in the fraud normally suppress evidence and impede the investigation. Moreover, the case against Librach reduces primarily to a test of credibility between Fowler and the defendant as to Librach's knowledge whether the furniture had been moved when he claimed reimbursement. Defendant failed to show how the three witnesses would aid him on that issue and otherwise failed to demonstrate adequate prejudice. In fact, there is evidence that Librach started to construct his defense shortly after the first FBI interview. This would be the usual and ordinary reaction of any person, guilty or not, who was involved in a web of government payments on fraudulent claims.

III. Defendant argues that the Government knew that Fowler perjured himself during trial, since his testimony was inconsistent with his prior sworn statement, and that the court erred in refusing to strike the testimony. The jury, however, was fully informed of Fowler's inconsistent statements and he was corroborated in part by other witnesses. Assessing the credibility of witnesses is a matter solely for the jury even though there is strong impeaching evidence in the case. *United States v. Miles,* 472 F.2d 1145 (8th Cir.), *cert. denied,* 412 U.S. 907, 93 S.Ct. 2299, 36 L.Ed.2d 972 (1973). The defendant's contention that Fowler's testimony was so lacking in credibility as not to warrant belief does not appear well taken. Fowler's testimony, despite his prior inconsistent statements, in many facets could be viewed as more credible than that of the defendant. Defendant's version of knowing nothing about the undisputed fraud beggars belief. At the minimum he had a duty to investigate the correctness of his representations to the Government that 64 rooms of furniture had been actually moved into about 11 vacant units of his two 18-unit apartment buildings. The court did not err in refusing to strike the testimony.

IV. Defendant claims the court erred in permitting the Government to

lead and cross-examine its witness, Siegel, on direct examination under the guise of refreshing his recollection with his prior inconsistent grand jury testimony. Siegel testified to the grand jury that two years after the offense he heard a conversation in which the defendant identified the person who bought the hotel's furniture. The Government called Siegel at trial to prove Librach's guilty knowledge that the furniture was sold, not moved, despite the defendant's certification to the contrary. To the Government's surprise, however, Siegel testified somewhat confusingly that Librach said no such thing and that he had learned from someone other than the defendant the identity of the person who purchased the furniture.

Finding the witness to be evasive, the court permitted the Government to lead Siegel by reading aloud his grand jury testimony that he heard the defendant discuss sale of the furniture. As confusion continued, however, the court questioned Siegel directly and the witness responded that he had not heard the defendant make any such declaration. The court consequently struck the testimony, including Siegel's grand jury answers, and ordered the jury to disregard what Siegel said concerning the meeting between the defendant and others.

In the circumstances, we find no abuse of discretion in permitting the Government to lead its evasive witness to develop his testimony. *Lerma v. United States,* 387 F.2d 187, 190 (8th Cir. 1968); Rule 611(c), Fed.R.Ev. Nor did the court err in denying a mistrial. The court instructed the jury to disregard the objectionable portion of Siegel's testimony and no prejudice resulted from it. Siegel primarily told the jury that he had not heard Librach discuss the sale of the furniture.

V. Defendant's final contention is that he should have been charged and sentenced under 18 U.S.C. § 1012 (1970), a misdemeanor statute expressly proscribing frauds against HUD, rather than under the general felony fraud statute, 18 U.S.C. § 1001. Section 1012,

however, was not intended to serve as the exclusive criminal remedy for frauds against HUD so as to prevent use of the harsher general statute, § 1001, where applicable. *United States v. Brown,* 482 F.2d 1359 (9th Cir. 1973). When, as in this case, criminal conduct violates more than one statute, the Government is free to proceed under the harsher provision if it elects to do so. *United States v. Brown, supra; United States v. Eisenmann,* 396 F.2d 565, 568 (2d Cir. 1968).

The judgment of conviction is reversed and the case remanded for a new trial.