**UNITED STATES of America**

v.

**Frank DIECIDUE, Anthony Antone, Manuel Gispert, Larry Neil Miller, Frank Boni, Jr. and Homer Rex Davis.**

**No. 76–77 CR–T–H.**

United States District Court,
M. D. Florida,
Tampa Division.

March 10, 1978.

---

**1012**

William M. James, Jr., Eleanore J. Hill, Asst. U. S. Attys., L. Eades Hogue, Sp. Atty., U. S. Dept. of Justice, Tampa, Fla., for plaintiff.

Paul Antinori, Jr., Henry Gonzalez, B. Anderson Mitcham, Robert W. Knight, Tampa, Fla., James O. Brecher, Jacksonville, Fla., George D. Gold, Miami, Fla., James D. Arnold, Tampa, Fla., for defendants.

## ORDER ON MOTIONS FOR NEW TRIAL

HODGES, District Judge.

On October 5, 1977, while this case was pending on appeal, the Assistant U. S. Attorney appearing as counsel for the Government notified defense counsel by letter that: "I have recently learned that the legal fees for Ellis Marlow Haskew, a defendant-witness in the above-captioned case were paid by the Florida Department of Criminal Law Enforcement to Mr. Haskew's attorney, W. Ford Duane."

Based upon that revelation the Defendants Diecidue, Antone, Gispert, Miller, Davis and Boni thereafter filed motions for a new trial pursuant to Rule 33, F.R.Cr.P., and on November 7, 1977, the Court of Appeals relinquished jurisdiction and remanded the case to this Court for consideration of those motions.

This Court then scheduled and subsequently conducted an evidentiary hearing on March 2 and 3, 1978.[1] The moving Defendants were present with their attorneys. Testimony and evidence was received and argument of counsel was entertained.

The motions (as supplemented) make three distinct contentions:

1. Alleged perjury during trial by the Government's witness-defendant, Ellis Marlow Haskew (and alleged suppression of evidence by Government counsel), relating to the payment of Haskew's attorney's fees by the Florida Department of Criminal Law Enforcement.

2. Alleged perjury by the witness Haskew, uncorrected by Government counsel, as to the date on which he was taken into Federal custody before trial.

3. Alleged perjury by Government witness Willie Noriega (and alleged sup-

---

1. The Court was delayed in its consideration of the motions due to a protracted trial in the case of *United States v. Carter, et al.,* Case No. 77–83 Cr-T-H.

pression of evidence by Government counsel) relating to Noriega's prior use of explosives.

These contentions will be discussed in inverse order.

## ALLEGED PERJURY BY WILLIE NORIEGA

■ Willie Noriega has now testified as a Government witness in two protracted criminal cases tried before the undersigned in this District during the last eighteen months—this case and the more recent case of *United States v. Carter, et al.,* Case No. 77–83 Cr-T-H (in which Noriega was also named as a defendant and pled guilty to the charges against him).[2]

During the trial of this case (*U. S. v. Diecidue*), Noriega denied on cross examination by defense counsel that he had ever used explosives.

During the subsequent trial of the *Carter* case, however, the Government called as a witness, in addition to Noriega, one James Earl Wright who testified that he and another man had assisted Noriega on one of his attempted arsons by carrying to the scene a long wooden box containing a number of large plastic containers filled with liquid, and that Noriega had *told* them to be especially careful because the liquid was nitroglycerin.

The instant motion is predicated on that testimony by Wright which is said to establish perjury by Noriega when he said during the earlier trial of this case that he had never used explosives. It is apparent, however, that Wright's testimony would constitute, at most, impeaching evidence of a prior inconsistent statement by Noriega. Moreover, it was abundantly clear from the totality of the circumstances revealed by the evidence in the *Carter* case that the substance was not nitroglycerin but was, in fact, gasoline or other flammable liquid; and there is no support for the suggestion

that the Government suppressed contrary evidence.

This claim falls far short of the showing which must be made to secure a new trial (See discussion, *infra*).

## ALLEGED PERJURY BY HASKEW CONCERNING HIS FEDERAL CUSTODY

■ During cross examination Haskew was asked about his being taken into Federal custody subsequent to his initial arrest by State authorities on February 25, 1976. The precise question and answer were as follows:

Q Mr. Haskew, are you now and have you been in the custody of the federal authorities since your interview and confession and statement on February the 25th, 1976?

A No, Sir.

Record, Testimony of Ellis Marlow Haskew, Vol. III, at p. 87.

It is undisputed that Haskew was delivered into Federal custody on or about April 30, 1976. Yet, the moving defendants contend that his answer to the above question was "grossly misleading" to the point of being perjurious, and that Government counsel knowingly permitted the answer to stand uncorrected during the trial.

It is immediately apparent, however, that Haskew's answer to the question as phrased was factually accurate and, in any event, related to a form of impeachment rather than any probative issues in the case.

Accordingly, this claim also lacks merit as an asserted basis for a new trial.

## ALLEGED PERJURY BY HASKEW CONCERNING PAYMENT OF HIS ATTORNEY'S FEES

■ The most serious contention made by the motions is the claim that Haskew lied during the trial when he testified that

---

2. The *Carter* indictment named over twenty defendants and alleged a conspiracy to violate the Racketeer Influenced Corrupt Organizations Act (RICO, 18 U.S.C. § 1962). The indictment also alleged a substantive RICO offense and multiple counts of Mail Fraud. The central scheme as charged in the case involved the burning of buildings followed by the making of fraudulent fire insurance claims. Noriega was a core member of the conspiracy and served as the principal arsonist or "torch." He was a key Government witness in the *Carter* trial, but was a lesser albeit important witness in the earlier *Diecidue* trial.

he retained his lawyer with his own funds, a falsity disclosed to the defense by the post trial letter from Government counsel dated October 5, 1977.

Haskew's testimony on the point at trial, and the context in which it arose, is as follows:

BY MR. HOGAN:

Q  Mr. Haskew, I don't want to belabor the agreement you made with the federal government in exchange for your testimony, because we've been over that, but there are a couple of things I'd like to go into.

Did you hire an attorney to represent you?

A  Yes, I did.

Q  Have you paid him from your own funds?

A  Yes, sir.

Q  Was he present here in court when you pled guilty before His Honor, Judge Hodges?

A  Yes, he was.

Q  Had he discussed with you the agreement you had made with the government?

A  Yes, sir.

Q  In detail?

A  While we were briefing before we went into the courtroom, yes, sir.

Q  And the agreement was that you were to receive no more than 35 years from the federal judiciary of the sentence.  Is that correct?

A  Yes, sir.

Q  And also did you discuss with him the particular statute that you were to be sentenced under?

A  Yes, sir.

Q  Do you recall now what that was?

A  Not the statute.  I think it's referred to as A–2 or B–2.

Q  And what was your understanding as to that particular statute?

A  That—I think federal prison you have to do a third of your term before you're eligible to parole.  If you are sentenced under this particular statute, it's a discretionary matter;  the Parole Board can excuse you earlier.

Record, Testimony of Ellis Marlow Haskew, Vol. IV, at pp. 23 and 24.

It is now undisputed that, in fact Haskew's attorney was paid by the Florida Department of Criminal Law Enforcement, and the circumstances surrounding those events as well as the Government's knowledge of them constituted the focal point of the evidentiary hearing conducted on the motions.  The salient facts are as follows.

Immediately after the murder of former City of Tampa police officer Richard Cloud on October 23, 1975, at his home in Tampa, various Special Agents of the F.B.I. coordinated with their state counterparts, representatives of the Florida Department of Criminal Law Enforcement (FDCLE) as well as local law enforcement agencies, in the formation of an investigative "task force" to solve the crime.[3]  The investigation bore fruit on February 25, 1976, when Haskew was arrested in Miami by Agents of the FDCLE.  After an initial denial of his guilt Haskew made a full confession concerning his involvement as well as the complicity of others in the overall conspiracy.  He was promptly transported to Tampa, testified before the state court grand jury on February 26 (the day following his arrest), and was indicted that day with the Defendant Antone and Benjamin Foy Gilford (since deceased) for the first degree murder of Richard Cloud.[4]

An unusual incident apparently occurred during Haskew's testimony before the state court grand jury on February 26.  An attorney appeared outside the grand jury room claiming to represent Haskew.  Upon being informed of his presence Haskew denied that the lawyer represented him or that he had asked him to be there, and the attorney then departed.  Within a few days after that incident (perhaps even the same

---

**3.**  Federal officers took an interest in the case because Cloud had been assisting in on-going Federal criminal investigations (see, specifically, Count Eleven of the indictment).

**4.**  The Federal indictment—this case—was not returned until approximately three months later on May 28, 1976.

day or the next day), the "task force" had a meeting in the Tampa office of the F.B.I. concerning the on-going investigation. In attendance were various Special Agents of the F.B.I. including David J. Malarney, who ultimately became the Case Agent in this case, and representatives of the FDCLE including Lloyd First, Director of Staff Services of that agency. One of the topics of conversation during the meeting was the recognized necessity that Haskew have counsel, and the expressed hope (by Malarney among others) that the lawyer would not be a "plant" to hamper the investigation by actually representing the interests of those against whom Haskew might testify. The conversation concerning that subject concluded with First merely saying "I'll take care of that," meaning that he would assume responsibility for seeing that Haskew either secured counsel or was afforded counsel.[5]

Although the subject of Haskew's financial ability to retain counsel does not seem to have been discussed at the meeting, First assumed that Haskew would lack the necessary resources.[6] Accordingly, he discussed the matter with Lawson L. Lamar, an Assistant State Attorney in Orlando, and received a reference from him to attorney W. Ford Duane.[7] First then met with Duane and offered to retain him to represent Haskew. Duane agreed to undertake the representation, subject to Haskew's agreement; and, after he met with Haskew, the representation was consummated. First thereafter paid Mr. Duane's fees and expenses in cash with funds obtained by

vouchers drawn from time to time over a three month period in First's name upon FDCLE "confidential funds" accounts. The total payments aggregated $11,500.00.

Significantly, according to First, he never reported back or otherwise informed any F.B.I. Agent or other Government representative concerning his activities in obtaining counsel for Haskew, and no one ever asked him about the subject. Only his superior and possibly one or two of his FDCLE associates ever knew of the arrangement. Duane also testified that he never told anyone about the circumstances surrounding his appearance in the case, and when casually asked about the matter on two occasions by state court prosecutors, he told them it was none of their business.

Malarney testified that when Duane first appeared as Haskew's lawyer he was told by someone (probably FDCLE Agent Campbell) that Duane was "O.K.," meaning that he was not a "plant," and that he (Malarney) never gave the matter any further thought and never made any inquiries as to how Haskew might be paying the cost. Similarly, Assistant U. S. Attorney William M. James, Jr., chief Federal prosecutor in the case (called as a Court's witness during the hearing on March 3, 1978), testified that he assumed Haskew had used the proceeds of his admitted crimes to engage counsel, that he made no inquiries about the matter, and was never told by anyone that Mr. Duane had in fact been retained and paid by the FDCLE until shortly before his letter to counsel bringing the circumstances to light.[8]

---

**5.** Special Agent Malarney testified that he recalled the meeting and the discussion concerning counsel. He did not specifically remember the concluding remark by First, but conceded that he may have made it.

**6.** Haskew, of course, was not present at the meeting and First never talked to him about the subject of counsel or, for that matter, anything else. First only saw Haskew on two occasions and did not engage him in conversation, beyond saying "hello," at either time.

**7.** Mr. Lamar, as an Assistant State Attorney, would be a prosecuting officer but Orlando is in another judicial circuit of the state and it does not appear that Lamar in particular, or that Circuit in general had any connection with

Haskew or the pending state case in any way. The reason First did not consult the Hillsborough County State Attorney in charge of the then pending case, or otherwise leave the matter of appointment of counsel to regular procedures, does not appear in the record. While it does seem that the Hillsborough County State Attorney was later removed from the case and a special prosecutor appointed by the Governor, there is no suggestion that those events had anything to do with the matter of First's direct retention of Mr. Duane as Haskew's lawyer.

**8.** The payments apparently became the subject of a 1977 internal audit or investigation by the FDCLE, and James was first notified concern-

It is, in summary, undisputed by the Government that Haskew answered falsely when he testified that he paid his lawyer from his own funds.[9] There is an issue, however, as to whether the Government knew or should have known that the answer was false, and whether it did, in fact, suppress the evidence concerning the FDCLE's payment of Haskew's counsel fees. To the extent that fact issue may be important to the ultimate rule of law to be applied in the case, it must be determined.

Upon due consideration, unless the knowledge of FDCLE Staff Services Director Lloyd First is to be imputed to the Federal Government by operation of law under the circumstances of the case, there is no evidence whatever to support a factual finding that any representative or employee of the Federal Government ever had any actual knowledge of the facts surrounding the engagement of Mr. Duane as Haskew's lawyer until long after the trial. Also, contrary to the suggestions of counsel for the moving defendants, I find no factual basis on which to charge the Government with knowledge merely because neither the Federal prosecutors nor the case agents ever made inquiries concerning the circumstances surrounding Mr. Duane's appearance on the scene as Haskew's lawyer. Defendants contend that this was an "obvious" question that Government counsel was bound to ask in fulfillment of their *Brady*[10] obligation to ferret out exculpatory information. It must be remembered, however, that although the State and Federal investigative authorities cooperated through a joint "task force," the first judicial proceeding of any kind occurred in state court, and no law has been cited nor usual custom and practice

shown to the effect that Government representatives should have been officially inquisitive merely because private counsel subsequently appeared for Haskew in their dealings with him.[11] It is certainly not a routine question for the Government to inquire into the attorney-client relationship whenever private counsel appears for a witness or a defendant; and, in most instances at least, it would be none of the Government's business if it did inquire. Indeed, in the absence of actual or imputed knowledge already in possession of the Government, any duty of specific inquiry under the circumstances would seem to be upon the defense in the first instance, not the prosecution. C. f. *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

The Government had no actual knowledge and the circumstances were not such that any duty arose, in fact or in law, requiring the Government to make inquiry. There was, therefore, no prosecutorial misconduct or negligence; but the question still remains as to whether, given the cooperation between Federal and State agencies in setting up a joint investigative "task force," knowledge of the state officers should be imputed to the representatives of the Federal Government as a matter of law despite their lack of actual knowledge as well as the absence of circumstances giving rise to a duty to make inquiry. No controlling authority has been cited to the Court on this point.

Of course, in *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), citing Restatement of Agency (Second), Section 272, and also the A.B.A. Standards for Criminal Justice, Discovery and Procedure Before Trial § 2.1(d), the Supreme

---

ing that investigation in August, 1977, many months after the trial.

9. Whether the testimony was perjurious is wholly problematical (given the necessary element of willfullness inherent in the offense of perjury and the possibility that Haskew might have an innocent explanation for the answer stated). From the standpoint of the pending motions, however, it is enough that the answer was clearly false.

10. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

11. The fact that First had said, to FBI Agents as well as his own associates, that he would "take care of" seeing that Haskew had counsel was not so unusual in that setting as to imply that he was going out to employ and pay counsel directly; and, by the same token, such a statement was not so peculiar or suggestive as to raise a duty on the part of Government officers to make a later inquiry concerning the actual procedures he employed. There was no negligence involved.

Court had no difficulty in charging the Government with the knowledge of an Assistant U. S. Attorney other than the one who tried the case, and a new trial was ordered where a promise of immunity previously given to a key Government witness by the non-trial attorney had not been disclosed to the defendant during trial. Similarly, in *United States v. Deutsch*, 475 F.2d 55, 57 (5th Cir. 1973), the Fifth Circuit held:

> We find no reference in *Brady* to an arm of the prosecution. It was a Post Office employee who had been sought to be bribed. The government cannot compartmentalize the Department of Justice and permit it to bring a charge affecting a government employee in the Post Office and use him as its principal witness, but deny having access to the Post Office files. In fact it did not even deny access, but only present possession without even an attempt to remedy the deficiency. *Cf. Barber v. Page*, 1968, 390 U.S. 719, 723–724, 88 S.Ct. 1318, 20 L.Ed.2d 255. We do not suggest by citing *Barber* that the government was obliged to obtain evidence from third parties, but there is no suggestion in *Brady* that different 'arms' of the government, particularly when so closely connected as this one for the purpose of the case, are severable entities.

See also *Schneider v. Estelle*, 552 F.2d 593 (5th Cir. 1977) and *United States v. Rosner*, 516 F.2d 269 (2d Cir. 1975), *cert. denied*, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976), each of which suggests that the prosecutor is charged with the knowledge of any investigative member of the prosecution team who actually testifies as a witness in the case. Otherwise, however, the extent to which "third party" knowledge should be imputed to the Government in a *Brady* or *Giglio* context is apparently being left to "case-by-case treatment." *United States v. Trevino*, 556 F.2d 1265, 1272 (5th Cir. 1977).

In this instance, as already observed, the F.B.I. Agents coordinated with their state and local counterparts in forming an *investigative* "task force," a laudable and common occurrence. With regard to the State and Federal *prosecutions*, however, it appears that each prosecuting office proceeded largely in reliance upon its own agencies and personnel, i. e., this was not one of those situations sometimes encountered in which the Government utilizes a state agency file or state personnel almost exclusively in "making the case" or presenting the evidence at trial.[12]

The A.B.A. Standards for Criminal Justice, Discovery and Procedure Before Trial § 2.1(d), cited by the Supreme Court in *Giglio*, provides:

> (d) The prosecuting attorney's obligations under this section extend to material and information in the possession or control of members of his staff and of any others who have participated in the investigation or evaluation of the case *and* who either *regularly report* or with reference to the particular case *have reported to his office*. (Emphasis supplied)

Since there is no evidence that Lloyd First reported to the U. S. Attorney's Office or otherwise composed a part of the Federal prosecution team preparing this case for trial, his knowledge concerning the payment of Haskew's attorney's fees is not imputable to the Government.

Thus, even though there was no prosecutorial negligence or misconduct (that is, no prosecutorial fault), and no reason to impute knowledge to the Government, the fact remains that Haskew's answer concerning the payment of his lawyer was false. What rule of law or standard applies in those circumstances? The authorities are not easily reconciled.

The usual standard to be employed in passing upon Rule 33 motions for a new

---

**12.** While some state and local officers were called as witnesses, of course, Lloyd First played no discernable role whatever in the trial of this case and there is no suggestion that he was ever specifically authorized by any Federal officer to engage Haskew's attorney in the unorthodox manner he pursued. Neither is there any indication that the two prosecution teams were interdependent in any way. Although the separate state and Federal plea bargains with Haskew were negotiated jointly, that was done not because of any apparent conditions established by the prosecutors but because Duane insisted that Haskew enter Federal custody for security reasons.

trial based upon newly discovered evidence has been stated many times in Fifth Circuit decisions as follows:

> The standards of this court to be met for a new trial on the grounds of newly discovered evidence are: The evidence must be discovered following trial; there must have been diligence on the part of the movant to discover the new evidence; the evidence is not merely cumulative or impeaching; the evidence is material; and a new trial would *probably* produce a different result. (Emphasis supplied)
>
> *United States v. Bryant,* 563 F.2d 1227, 1231 (5th Cir. 1977).

See also, e. g., *United States v. Rachal,* 473 F.2d 1338, 1343 (5th Cir.), *cert. denied,* 412 U.S. 927, 93 S.Ct. 2750, 37 L.Ed.2d 154 (1973); *United States v. Jacquillon,* 469 F.2d 380, 388 (5th Cir. 1972), *cert. denied,* 410 U.S. 938, 93 S.Ct. 1400, 35 L.Ed.2d 604 (1973); *Hudson v. United States,* 387 F.2d 331, 333 (5th Cir. 1967), *cert. denied,* 393 U.S. 876, 89 S.Ct. 172, 21 L.Ed.2d 147 (1968).

The relevant Supreme Court decisions dealing with motions for a new trial (or collateral relief) on *constitutional* grounds all involve situations in which there was some species of prosecutorial fault because the prosecution withheld evidence it either knew about or should have known about. Despite the previously stated conclusion that the prosecution was not at fault in this case, those decisions should be noted. In *Mooney v. Holohan* and *Pyle v. Kansas*[13] the Court established that allegations of a prosecutor's knowing use of perjured testimony and deliberate suppression of evidence favorable to the accused, if proved, would constitute a denial of due process of

law warranting habeas corpus relief. In the more recent *Napue, Brady* and *Giglio*[14] decisions the Court made it clear that the due process requirement of prosecutorial fair play "does not cease to apply merely because the false testimony goes only to the credibility of the witness" (*Napue,* 79 S.Ct. at 1177); that the rule applies "irrespective of the good faith or bad faith of the prosecution" (*Brady,* 83 S.Ct. at 1197), and regardless of "whether the nondisclosure was a result of negligence or design . . ." (*Giglio,* 92 S.Ct. at 766). When these authorities supply the governing rule of law, the standard to be applied in deciding a motion for new trial is whether the undisclosed evidence or false testimony was "material" (*Brady,* 83 S.Ct. at 1196–1197), that is, whether it "could . . . in any reasonable likelihood have affected the judgment of the jury . . ." (*Napue,* 79 S.Ct. at 1178; *Giglio,* 92 S.Ct. at 766).[15]

The Supreme Court decisions are of interest because, although they involve prosecutorial fault and are distinguishable on that ground,[16] there is a strong suggestion in some decisions that the same, less stringent standard of materiality applies whenever perjury is shown regardless of prosecutorial entanglement. Recently, in *United States v. Hamilton,* 559 F.2d 1370 (5th Cir. 1977), citing *Larrison v. United States,* 24 F.2d 82 (7th Cir. 1928), the Fifth Circuit expressly recognized that there is authority for the proposition that where perjury is shown a new trial should be granted if the jury "might" have reached a different result absent the false testimony. See also *United States v. Smith,* 433 F.2d 149 (5th Cir. 1970), and *Newman v. United States,* 238 F.2d 861 (5th Cir. 1956) for other Fifth

---

**13.** *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935); *Pyle v. Kansas,* 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942).

**14.** *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

**15.** But see *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), apparently holding that when the disputed evidence was not specifically requested by defense counsel

and the nature of the evidence does not suggest perjury at trial, a new trial should be granted only "if the omitted evidence creates a reasonable doubt that did not otherwise exist . . ." Id. at 2401, 96 S.Ct. at 2401.

**16.** See *United States v. Johnson,* 487 F.2d 1318, 1325 f. n. 8 (5th Cir.), *cert. denied,* 419 U.S. 825, 95 S.Ct. 41, 42 L.Ed.2d 48 (1974), noting the distinction between motions asserting newly discovered evidence in general and motions suggesting prosecutorial misconduct in particular.

Circuit expressions of that rule. In *Hamilton,* however, the Court also recognized the existence of a recent, well reasoned criticism of that standard by the Second Circuit in *United States v. Stofsky,* 527 F.2d 237 (2d Cir. 1975), *cert. denied,* 429 U.S. 819, 97 S.Ct. 41, 50 L.Ed.2d 80 (1976), but found it unnecessary to resolve the question because of its determination that the alleged perjury in the case before it did not affect the outcome applying either standard.[17]

It is appropriate, therefore, for this Court to approach the case *sub judice* in the same manner and evaluate the circumstances by first applying the least stringent standard. Does a full consideration of the total record support a finding that Haskew's false answer concerning his attorney's fees "might" have affected the jury's verdicts? I am convinced that it does not.

It should be remembered in the first instance that the false answer related to a subject which would be germane only to Haskew's credibility as a witness, not a substantive issue of fact in the case. While this feature does not by any means resolve the issue raised by the pending motions (c. f., *Napue v. Illinois, supra* ), it does narrow the inquiry to the question of whether the jury "might" have discredited Haskew as a witness if he had been impeached with the truth about his attorney's fees.

Haskew was on the witness stand for four days altogether, and was subjected to cross examination for more than two days by eight experienced lawyers.[18] He was successfully attacked as a witness through the use of every recognized means of impeachment known to the law. He admitted numerous felony convictions and a wide variety of other criminal acts; he admitted to having used addictive drugs; he admitted to having undergone treatment for mental illness; he admitted to prior inconsistent statements concerning the subject of his trial testimony; he admitted numerous conferences with F.B.I. Agents and the prosecutors while refusing to discuss the case with defense counsel; he admitted that he had lied in the past to help himself; he admitted personal bias against at least one of the defendants; he admitted the particulars of his plea bargains with the state and the Government, and that he was testifying in exchange for those agreements; he admitted further that he was testifying to avoid "riding the thunderbolt" (the electric chair) and, literally, to save his own life; and the Superintendent of the state penitentiary was even allowed to testify that Haskew had a bad reputation for truth and veracity in the community, i. e., the state prison being the only "community" in which Haskew had recently resided.[19]

Despite this wholesale impeachment of Haskew as a witness the jury obviously credited most of his substantive testimony presumably because of their conclusion that he was corroborated in many instances by the tangible evidence and the testimony of numerous other witnesses; and it is inconceivable that those assessments by the jury would have been altered or affected in any way whatsoever by the added impeachment evidence concerning the payment of his lawyer by the FDCLE. The circumstances surrounding the payment of Haskew's lawyer pales into total insignificance as impeachment when considered against the backdrop of all of the other impeaching evidence the jury had before it.[20]

---

**17.** In *Stofsky* the Second Circuit opted in favor of the usual standard despite an allegation of perjury, and it tested the issue on the basis of whether the verdict would "probably" have been different, rather than "might" have been different, absent the perjury.

**18.** The transcript of Haskew's testimony is approximately 610 pages of which about 350 pages consists of cross examination.

**19.** Attached as an Appendix to this Order, as abstracted from the Government's memorandum, is a compendium of transcript references to the numerous instances of Haskew's impeachment on cross examination. The jury, of course, was given complete instructions concerning the credibility of the witnesses generally and these various forms of impeachment in particular, and were *specifically charged that the testimony of such a witness should be received with caution and weighed with great care.*

**20.** Indeed, evidence of the state's payment of Haskew's lawyer would be a dubious form of impeachment evidence in the first place. The testimony of Lloyd First is to the effect that he

The Defendants cite three decisions upon which they principally rely. *United States v. Librach,* 520 F.2d 550 (8th Cir. 1975), cert. denied, 429 U.S. 939, 97 S.Ct. 354, 50 L.Ed.2d 308 (1976); *Barbee v. Warden, Maryland Penitentiary,* 331 F.2d 842 (4th Cir. 1964), and *Nash v. Purdy,* 283 F.Supp. 837 (S.D.Fla.1968). Each is readily distinguishable on grounds of prosecutorial fault and significance of the evidence suppressed. *Librach* involved prosecutorial suppression of evidence that a key Government witness, not otherwise impeached, had been participant in the protected witness program and had been paid approximately $10,000. Similarly, *Barbee* and *Nash* both involved prosecutorial suppression of critical substantive evidence bearing directly in each case upon the issue of guilt or innocence.

The Government cites *United States v. Minichiello,* 510 F.2d 576, 578 (5th Cir. 1975):

> The appellant also argues he should have been granted a new trial because the informant Gould perjured himself when he testified he was not a paid informant . . . The fact of Gould's cooperation and arrest were brought out at trial. Those agents who were aware of the payments had been excluded from the courtroom at the time the testimony was given, and the prosecutor had not been informed of the payments. In other circumstances, a similar omission on the part of the Government might cast sufficient doubt on the credibility of the informer testifying so as to require the grant of a new trial. Here, however, the jury had adequate information that Gould was trying to save his own skin. The question whether he was paid, and for what, is not so material as to require a new trial. *Giglio v. United States,* 1972, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104; *United States v. Johnson,* 5 Cir. 1974, 487 F.2d 1318.

The motions for a new trial are severally DENIED.

IT IS SO ORDERED.

---

unilaterally undertook to employ counsel without consulting Haskew, i. e., it was not a condition or favor sought or bargained for by Haskew himself; and, of course, if he *was* indigent it became the constitutional obligation of the state to provide counsel at its expense. *Query:* if a witness-defendant is "impeached" by proof that the state or Government supplied his lawyer, to what extent would the prosecution be entitled to a contemporaneous jury instruction that the witness had a constitutional right and the state or Government owed a constitutional duty regarding counsel?